**PENOBSCOT AIR SERVICES, LTD., Petitioner,**

v.

**FEDERAL AVIATION ADMINISTRATION, Respondent.**

**No. 98–1133.**

United States Court of Appeals, First Circuit.

Heard Oct. 9, 1998.

Decided Jan. 19, 1999.

714

Joseph D. Kuchta, with whom Kuchta & Brinker were on brief for petitioner.

John S. Koppel, Attorney, with whom Frank W. Hunger, Assistant Attorney General, and Anthony J. Steinmeyer, Attorney, United States Department of Justice, Civil Division, were on brief for respondent.

Before BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.

BOWNES, Senior Circuit Judge.

This case comes to us on a petition for review of a final decision of the Federal Aviation Administration (FAA), pursuant to 49 U.S.C. § 46110. Penobscot Air Services, Inc. (Penobscot) filed with the FAA a complaint alleging that the Knox County Board of Commissioners (Knox County), owner of the Knox County Regional Airport, violated Penobscot's rights under the Federal Aviation Act (the Act). Specifically, Penobscot alleged that Knox County violated provisions of the Act that bar unjust discrimination, *see* 49 U.S.C. § 47107(a)(1), (5), and the award of an "exclusive right," *see* 49 U.S.C. § 40103(e). The complaint also claimed that Penobscot was entitled to an evidentiary hearing pursuant to 49 U.S.C. §§ 46101, 46104. The FAA rejected Penobscot's claims; we affirm.

## I

### BACKGROUND

Penobscot is a tenant leasing space at Knox County Regional Airport. It is a fixed-base operator (FBO) at the airport, which means it provides "services similar to those that a service station provides for those who operate automobiles." *City of Pompano Beach v. F.A.A.*, 774 F.2d 1529, 1532 n. 5 (11th Cir.1985) (internal quotation marks omitted). It also provides air charter service.

Penobscot filed a formal complaint at the FAA in 1997, charging that Knox County had violated Penobscot's rights under the Federal Aviation Act. Specifically, Penobscot alleged that Knox County had violated provisions of the Act and applicable grant agreements in two ways: by charging Penobscot higher rent than another FBO (Downeast Airlines) that leased space at the airport; and by prohibiting Penobscot from conducting its aircraft repair business on the same terms as another company, Barnstorm Aviation, because Knox County allegedly did not require Barnstorm to comply with its minimum standards, as it required of Penobscot.

The Director of the FAA Office of Airport Safety and Standards evaluated Penobscot's complaint, the answer filed by Knox County, and the documentary evidence submitted by the parties, and issued a decision dismissing all of Penobscot's claims. The 28–page Record of Decision (ROD) analyzed the issues and concluded that Knox County did not violate its federal obligations. The ROD also found that Penobscot was not entitled to an evidentiary hearing in this case.

Penobscot administratively appealed the FAA's initial agency decision, reiterating the same arguments. The FAA Associate Administrator for Airports issued the agency's final decision affirming the ROD. This appeal followed.

## II

### Standard of Review

The applicable standard of review for FAA action is provided by the Federal Aviation Act and, by default, the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1994). *See Public Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 196 (D.C.Cir.1993). These statutes require us to apply different standards of review depending upon what type of determination we are reviewing.

### A. The FAA's Factual Findings

Under the Federal Aviation Act (the Act), we review the FAA's findings of fact to de-

termine whether they are "supported by substantial evidence." 49 U.S.C. § 46110(c) (1994). Findings of fact that are so supported are "conclusive" and may not be disturbed on appeal. *Id.*

As the Court has explained in the context of the APA, substantial evidence review is conducted on the record considered as a whole.[1] *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *see Greater Orlando Aviation Auth. v. F.A.A.*, 939 F.2d 954, 958 (11th Cir.1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477, 71 S.Ct. 456 (internal quotation marks omitted), *quoted in American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 522, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) (*ATMI*); *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). The reviewing court must take into account contradictory evidence in the record. *Universal Camera*, 340 U.S. at 487–88, 71 S.Ct. 456 (The reviewing court must consider "the record in its entirety . . ., including the body of evidence opposed to the [agency's] view."); *see Greater Orlando Aviation Auth.*, 939 F.2d at 958. But "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *ATMI*, 452 U.S. at 523, 101 S.Ct. 2478 (internal quotation marks omitted).

In *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 118 S.Ct. 818, 823, 139 L.Ed.2d 797 (1998), the Court equated the substantial evidence standard with "whether on this record it would have been possible for a reasonable jury to reach the [agency's] conclusion." The "substantial evidence" test "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree that *could* satisfy a reasonable factfinder." *Id.* at 828. This is an "objective test," *id.*, so, for example when the agency "purports to be engaged in simple factfinding, . . . it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands," *id.* at 829; *see Indiana Fed'n of Dentists*, 476 U.S. at 454, 106 S.Ct. 2009.[2] The agency's findings "must . . . be set aside when the record before a Court of Appeals clearly precludes the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Universal Camera*, 340 U.S. at 490, 71 S.Ct. 456.

**B.** *The agency's decisions on legal issues.*

In view of Section 46110's silence as to the standard for reviewing nonfactual matters, the standard of review for such matters is provided by section 10(e) of the Administrative Procedure Act. *Public Citizen*, 988 F.2d at 196.

Errors of law are reviewed by the court de novo. *See* 5 U.S.C. § 706 ("[T]he reviewing court shall decide all relevant questions of law."); *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 97 n. 7, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983); *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir.1996); *Howard v. F.A.A.*, 17 F.3d 1213, 1215 (9th Cir.1994). "The legal issues presented—that is, the identification of gov-

---

**1.** In applying substantial evidence review under the Act, we may be guided by the same principles that courts have applied to substantial evidence review under the APA. We note, however, that under the APA, such review is specifically applicable only in certain specifically delineated contexts, including rulemaking and formal adjudications. *See* 5 U.S.C. § 706(2)(E).

**2.** Thus, substantial evidence review is not a rubber stamp. *See Universal Camera*, 340 U.S. at 490, 71 S.Ct. 456 (concluding that "courts must now assume more responsibility for the reason-

ableness and fairness of [agency] decisions than some courts have shown in the past. Reviewing courts . . . are not to abdicate the conventional judicial function."). Indeed, in *Allentown Mack*, the Court found that the agency failed to satisfy this standard, because it refused to credit probative circumstantial evidence, and it demanded evidence beyond the applicable substantive standard. 118 S.Ct. at 823–24; *see N.L.R.B. v. Baptist Hosp., Inc.*, 442 U.S. 773, 782, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979).

erning legal standards and their application to the facts found—are, by contrast [to factual findings], for the courts to resolve, although even in considering such issues the courts are to give some deference to the [agency's] informed judgment" in applying statutory terms if the statute is silent or ambiguous on the issue. *Indiana Fed'n of Dentists,* 476 U.S. at 454, 106 S.Ct. 2009.

▮ That deference is described in the familiar two-step test of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which applies to the FAA as to other agencies. "On a pure question of statutory construction, our first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation *must be given effect,* and [agency regulations] must be fully consistent with it." *N.L.R.B. v. United Food & Commercial Workers' Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (*UFCW*) (emphasis added) (quoting *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 446–48, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). Thus, if the legislative intent is clear, we do not defer to the agency and we end the *Chevron* analysis at step one. *See Duckworth v. Pratt & Whitney, Inc.,* 152 F.3d 1, 5–6 & n. 6 (1st Cir.1998).

▮ We reach the second step of *Chevron* if "the statute is silent or ambiguous with respect to the specific issue"; then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *UFCW,* 484 U.S. at 123, 108 S.Ct. 413 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778). "Under this principle, we have traditionally accorded the [agency] deference with regard to its interpretation of the [statute] as long as its interpretation is rational and consistent with the statute." *Id.*

▮ Even where such deference is due, the agency's "explication" of its reasoning must be "not inadequate, irrational or arbitrary." *Allentown Mack,* 118 S.Ct. at 822

(internal quotation marks omitted); *see id.* at 826 (The APA "establishes a scheme of reasoned decisionmaking," under which "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.") (internal quotation marks omitted); *Bureau of Alcohol, Tobacco and Firearms,* 464 U.S. at 97, 104 S.Ct. 439 (explaining that reviewing court "must not rubber-stamp ... administrative decisions") (alteration in original). The reviewing court remains "the final authority on issues of statutory construction." *Pompano Beach,* 774 F.2d at 1540; *see* 5 U.S.C. § 706(2)(A).

### C. Review of FAA's Other Action and Conclusions

▮ With respect to other agency action, findings, and conclusions, the APA requires the reviewing court to hold them unlawful and set them aside if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

▮ The task of a court reviewing agency action under the APA's "arbitrary and capricious" standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " [3] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)); *see Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (citations omitted).

▮ The reviewing court must "look to see if the agency decision, in the context of

---

**3.** The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result, *see Federal Election Comm'n v. Rose,* 806 F.2d 1081, 1088 (D.C.Cir.1986), and respond to "relevant" and "significant" public comments. *Home Box Office, Inc. v. F.C.C.,* 567 F.2d 9, 35 & n. 58 (D.C.Cir.1977). However, neither requirement is particularly demanding. *Public Citizen, Inc.,* 988 F.2d at 196–97.

the record, is too unreasonable (given its statutory and factual context) for the law to permit it to stand." *Sierra Club v. Marsh*, 976 F.2d 763, 769 (1st Cir., 1992) (internal quotation marks omitted).[4]

In *State Farm*, the Supreme Court offered several examples of circumstances in which an agency action "normally" would be considered arbitrary and capricious: situations where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. "These are merely 'examples,' *Puerto Rico Sun Oil Co. v. United States E.P.A.*, 8 F.3d 73, 77 (1st Cir.1993); others could be recited as well." *Dubois*, 102 F.3d at 1285. "The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (citing *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).

"While this is a highly deferential standard of review, it is not a rubber stamp." *Dubois*, 102 F.3d at 1285 (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir.1995)). Although "the ultimate standard of review is a narrow one," the court must undertake "a thorough, probing, in-depth review" and a "searching and careful" inquiry into the record. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In order for an agency decision to pass muster under the APA's "arbitrary and capricious" test, the reviewing court must determine that the decision is "rational," *Citizens Awareness Network*, 59 F.3d at 290, that it "make[s] ... sense," *Puerto Rico Sun Oil*, 8 F.3d at 77.

Only by "carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision" can the court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851 (internal quotation marks omitted).

## III

### *Was An Evidentiary Hearing Required?*

Before reaching the merits, Penobscot presses a threshold question regarding process. Penobscot argues that it was entitled to a formal evidentiary hearing, basing this contention on the Act and on the due process clause of the Fourteenth Amendment. We reject both contentions.

### A

Penobscot argues that the FAA is obligated to hold a formal hearing by virtue of 49 U.S.C. § 46101(a) (1994) and the agency's regulations. Neither the statutory scheme nor the FAA's regulations require the agency to grant an evidentiary hearing to Penobscot. *Cf.* 1 K. Davis & R. Pierce, *Administrative Law Treatise* 379 (3d ed.1994) (noting that APA § 554(a) requires an agency to afford a formal trial-type hearing only in an "adjudication required by statute to be determined on the record after opportunity for an agency hearing"; if statute does not so require, then party is entitled only to the limited procedures in APA § 555); *see also Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 655–56, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). The statute provides that, when a person files a complaint about a person violating the Act or a requirement prescribed thereunder, the agency "shall investigate the complaint if a reasonable ground appears to the [agency] for the investigation." 49 U.S.C. § 46101(a)(1). The plain meaning of this language is that the agency first makes a determination, based on the complaint, as to whether there is "a reasonable ground" for

---

4. The Court has, at times, expressed this standard in a more forgiving way: the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *but see Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

investigating its merits, and if there is, then the agency is mandated to investigate.[5]

The statute further provides that the agency "may dismiss a complaint without a hearing when the [agency] is of the opinion that the complaint does not state facts that warrant an investigation or action." 49 U.S.C. § 46101(a)(3). On the other hand, "if the [agency] finds in an investigation under this subsection that a person is violating this part" of the Act, then "[a]fter notice and an opportunity for a hearing ..., the [agency] shall issue an order to compel compliance." 49 U.S.C. § 46101(a)(4). We read subsection 46101(a)(3), in context, as permitting the agency to dismiss a complaint without a hearing either when the complaint on its face fails to state facts that warrant any investigation at all, or when, after appropriate investigation, the agency determines that no further investigation is necessary and that no action is warranted on the allegations raised in the complaint.

■■■ Penobscot would have us require the agency to hold an evidentiary hearing if the complaint alleges facts sufficient to make out a prima facie claim that the statute has been violated, even if the agency's investigation finds such allegations unsupported by the facts. Penobscot offers no support for this proposition, and we do not read the statute to so require. *See Flying Tiger Line, Inc. v. Civil Aeronautics Bd.*, 350 F.2d 462, 465 (D.C.Cir.1965); *Flight Eng'rs Int'l Ass'n v. Civil Aeronautics Bd.*, 332 F.2d 312, 314 (D.C.Cir.1964).

To the extent there is any ambiguity in the Act, i.e., in Section 46101, it is resolved by the FAA regulations effectuating the statute, which are entitled to *Chevron* deference. Those regulations apply the procedural structure of 49 U.S.C. § 46101 to complaints filed with the agency alleging violations by airports of the Act or any other statute within the jurisdiction of the agency. *See* 14 C.F.R. pt. 16 (1998). The regulations require the complaint and all successive pleadings to provide a "complete statement of the facts

relied upon to substantiate each allegation" or "averment[ ] made," 14 C.F.R. § 16.23(b)(3) and (i), and require the parties to supply all "supporting documentation upon which [they] rely," 14 C.F.R. § 16.23(g). "Each party shall file documents that it considers sufficient to present all relevant facts and argument necessary for the FAA to determine whether the sponsor is in compliance." 14 C.F.R. § 16.29(b)(1).

Moreover, "[i]n rendering its initial determination, the FAA may rely entirely on the complaint and the responsive pleadings provided under [the] subpart" applicable to complaints. *Id.; see also id.* at § 16.29(b) (Whether the FAA's investigation includes more than that set forth in § 16.29(b)(1) is within "the sole discretion of the FAA."); *id.* at § 16.109(a) ("In cases in which a hearing is not required by statute, the FAA may provide opportunity for a hearing at its discretion.").

A hearing is required under the regulations only if the initial determination "finds the respondent in noncompliance and proposes the issuance of a compliance order."[6] 14 C.F.R. § 16.31(d). This is consistent with the statute, which speaks of an "opportunity for a hearing" only if the agency finds a violation and is considering issuing an order to compel compliance. *See* 49 U.S.C. § 46101(a)(4). Because the FAA's regulations constitute a permissible interpretation of the statute, they are entitled to deference. *See Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.

Penobscot points to provisions in the statute and the regulations setting forth procedures for conducting hearings in those cases where the agency holds a hearing. *See* 49 U.S.C. § 46104 (1994); 14 C.F.R. § 16.201–16.237. But, as discussed *supra*, neither the statute nor the regulations contain a provision requiring a formal hearing whenever a complaint is filed; they simply require one if a finding of noncompliance is made, which, of course, is not the case here. The procedural provisions Penobscot cites do not vitiate the agency's discretion in determining, after in-

---

5. Section 46101(a)(2) authorizes the agency to conduct an investigation on its own initiative, if a reasonable ground appears to do so.

6. Even in such a situation, the respondent may waive its right to a hearing. 14 C.F.R. § 16.31(d).

vestigation, that a particular complaint does not warrant a formal hearing. *See* 49 U.S.C. § 46101; 14 C.F.R. § 16.29(b). The cited procedural provisions simply set forth the procedures that the agency must apply whenever it does hold a hearing. It simply does not logically follow that an agency must hold a hearing in every case, merely because the agency sets forth provisions for procedures it will apply in those situations where it does decide that a hearing would be appropriate.

Finally, but certainly not least importantly, we note that an agency is permitted broad leeway in interpreting its own rules, as long as those interpretations are reasonable. *See Martin v. Occupational Safety & Health Rev. Comm'n,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (explaining that an "agency's construction of its own regulations is entitled to substantial deference" unless an inconsistent statutory meaning is "free from doubt"). And the agency here has interpreted its rules as *not* requiring an evidentiary hearing, which is consistent with its interpretation of the statute.

To counteract the force of the clear statutory and regulatory language, Penobscot relies on dictum in *Kemmons Wilson, Inc. v. F.A.A.,* 882 F.2d 1041 (6th Cir.1989). There, the FAA had found that the Memphis–Shelby County Airport Authority had not violated the "exclusive right" provision of the Act. The Sixth Circuit reversed because the record contained no evidence supporting the FAA's conclusions. The agency had failed "to analyze the issues presented and to make specific reviewable findings of fact and conclusions." *Id.* at 1047. The court then made the statement that 49 U.S.C.App. § 1482(a), which is now codified at 49 U.S.C. § 46101(a), "contemplates a 'hearing' if the complaint states 'a prima facie case.' " *Kemmons Wilson,* 882 F.2d at 1047.

We are not bound by the Sixth Circuit's dictum and we decline to follow it. As we have already explained, to require such a hearing would contradict the statute's statement that the agency may dispense with a hearing where it is of the opinion that the facts warrant no further action. It would also ignore the FAA's authoritative contrary interpretation of the statute, embodied in the agency's regulations. We defer to the agency's interpretation because it is "rational" and "based on a permissible construction of the statute." *UFCW,* 484 U.S. at 123, 108 S.Ct. 413 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778). Finally, *Kemmons Wilson* is distinguishable from the present case. There, the court ordered the FAA to hold a formal hearing because the court found the agency's investigation and its analysis inadequate. Here, in contrast, the FAA has fully investigated Penobscot's complaint and evaluated its merits prior to reaching its conclusion that it should be dismissed.

**B**

Nor does the due process clause of the Constitution require an evidentiary hearing on Penobscot's formal complaint. Penobscot argues that, as a tenant at Knox County airport, it is a beneficiary of the restrictive covenant in the airport's deed prohibiting unjust discrimination and grants of exclusive rights. As such, Penobscot claims a due process right to an evidentiary hearing before the FAA deprives it of its asserted property interest in enforcement of the restrictive covenant.

The due process clause is implicated where a party is deprived of a liberty or property interest, as defined by an independent source such as state law, to which he has "a legitimate claim of entitlement." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The FAA cannot deprive a party of constitutionally protected property without appropriate procedural safeguards. *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487 (internal quotation marks omitted).

The FAA argues that Penobscot's beneficial interest in the restrictive covenant is not a property interest such as would give rise to due process rights, because Penobscot has no

"entitlement" to the result it seeks.[7] *See Roth*, 408 U.S. at 577, 92 S.Ct. 2701. If it did, the FAA asserts, "then any statute imposing a mandatory regulatory duty on an agency would enable any person benefited by the regulation to assert a due process 'entitlement' that the agency do its job, and to insist on constitutional process in connection with every decision the agency made.... [T]he situation is akin to that posed in the general law enforcement context, where it is well settled that a citizen has no due process claim to law enforcement." Resp't Br. at 27–28 (citing *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). We need not decide whether Penobscot's property interest is sufficient to trigger the due process clause, because we hold, in any event, that even if it did, due process would not obligate the agency to hold a hearing on Penobscot's complaint.

The due process clause is " 'flexible and calls for such procedural protections as the particular situation demands.' " *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). In deciding how much process is due in any given situation, courts weigh "three distinct factors": (1) "the private interest [i.e., Penobscot's] that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the government's interest, including "the fiscal and administrative burdens" posed by alternative procedural requirements. *Eldridge*, 424 U.S. at 335, 96 S.Ct. 893.

The balance of these factors weighs in favor of the FAA. The first factor carries weak, if any, weight for Penobscot, whose interest is rather attenuated. The primary property interest in the restrictive covenant is held by the United States, to whom the land shall revert upon breach of the covenant. Penobscot essentially benefits from the covenant as any member of the public benefits from the requirement of non-exclusive access to the airport. Penobscot stands to earn a certain amount of profits if the requirement is enforced, while members of the public, as consumers, would benefit from purchasing airport services at lower prices from more efficient companies.

In addition, Penobscot's interest must be discounted to the extent that it is asserting a right to free itself of its voluntarily negotiated contract rents. Such an improvement in its commercial competitive position does not hold much weight in the *Eldridge* balancing, especially since Penobscot does not have a legally created entitlement to the result it seeks. *See infra* 164 F.3d at 727–28.

In short, Penobscot's interest pales in comparison with the interests at issue in the cases it cites in its brief. *See, e.g., United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (*ex parte* seizure of property owner's home pending forfeiture proceeding); *Connecticut v. Doehr*, 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) (prejudgment attachment of real property without prior notice); *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (labeling organizations "subversive," affecting not only the organizations themselves but also their members, including members' rights to maintain federal jobs).

The second *Eldridge* factor is also of scant aid to Penobscot. There is no significant risk that the FAA's refusal to hold a hearing erroneously deprived Penobscot of its attenuated interest. The risk of error is particularly small in a case like this, given the nature of the issues and type of evidence involved. *See Eldridge*, 424 U.S. at 335, 96 S.Ct. 893. Here, most of the historical facts were essentially undisputed, and the FAA's decision, for the most part, involved interpretation of statutes, regulations, and policies, and applying them to the undisputed facts. No credibility

---

7. The FAA points out that it is the United States that has the property interest in the restrictive covenant; Penobscot is merely the beneficiary of the government's interest. Thus, the FAA argues, the government may decide for itself whether to enforce its own interest and Penobscot has no right to compel such enforcement.

issues lend themselves to a face-to-face proceeding. Moreover, the FAA's investigation appears to have been thorough, and its initial and final decisions fully discussed all issues raised by Penobscot in its submissions to the agency.

Nor has Penobscot pointed to any appreciable benefit likely to be derived from requiring an evidentiary hearing. It has not demonstrated how an evidentiary hearing would yield either evidence of a different nature or a different treatment of evidence already gathered. Penobscot certainly cannot claim a right to withhold certain evidence or arguments from the FAA's investigators, waiting to spring them on the agency at a hearing.

Penobscot treats this case as if the FAA had offered the company absolutely no opportunity to present its side of the case. Indeed, Penobscot refers to the FAA's procedure here as "*ex parte*" and cites cases that decry factfinding without offering the "person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *See McGrath*, 341 U.S. at 171–72, 71 S.Ct. 624. Penobscot's argument is inapplicable to the present case. Penobscot did not lack notice of the issues the FAA was investigating and, significantly, had every opportunity to submit whatever evidence or argument it thought appropriate to support its position. Indeed, FAA regulations plainly invited Penobscot to submit all such supporting documentation. *See* 14 C.F.R. §§ 16.23(b)(3), (g), (i); 16.29(b)(1). Thus, the FAA's procedure was not *ex parte;* all parties were permitted to participate, although not in an adversary setting.

■ The third and final *Eldridge* consideration is the "fiscal and administrative burdens" that would be entailed if we were to require an evidentiary hearing in cases such as this. *Eldridge*, 424 U.S. at 335, 96 S.Ct. 893. On the surface, at least, it appears that such a requirement could amount to a not insignificant burden on the FAA in allocating its resources among its various enforcement efforts.[8] If Penobscot's argument were accepted, the FAA would be required to conduct trial-type hearings in connection with nearly every complaint filed with it.[9] This would require the agency to invest its scarce resources in holding formal hearings on complaints that its investigation shows did not involve any violations, at the expense of other enforcement efforts to protect the public from aviation hazards. The due process clause does not require such a result.[10]

Penobscot speculates that "conducting evidentiary hearings in airport cases involving important property or liberty interests would result in more vigorous protection of these interests." Thus, it argues, the FAA would face fewer complaints in the long run by providing more process in the short run. The contrary appears more likely: requiring formal evidentiary hearings in all such cases would force the FAA to over-invest procedurally in claims that might be assessed just as accurately without an oral proceeding. Pe-

8. We recognize that any hearing "always imposes some costs in time, effort, and expense, and it is often more efficient to dispense with the opportunity for such a hearing." *Fuentes v. Shevin,* 407 U.S. 67, 90 n. 22, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Thus mere "administrative burden" alone cannot ordinarily serve as a rationale for outweighing serious due process rights to fair adjudications. *See Goss v. Lopez,* 419 U.S. 565, 580, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (explaining that risk of error must be guarded against "if that may be done without *prohibitive* cost") (emphasis added); *Fuentes,* 407 U.S. at 90 n. 22, 92 S.Ct. 1983 ("[P]rocedural due process is not intended to promote efficiency."). Nevertheless, although administrative cost is not given controlling weight, it is a part of the *Eldridge* balancing.

9. Penobscot argues that this is not true, that hearings would only be required where the complainant raised "an important property or liberty interest." If, however, Penobscot's beneficial interest in a restrictive covenant (where the government has the primary property interest) is sufficient to require a hearing, then a very high percentage of complainants would be able to raise a similar property or liberty interest.

10. Penobscot's argument, if applied to other law enforcement contexts, would require us to hold, for example, that a police department, when it receives a complaint about possible violation of law and attempts to investigate it, must give the complainant a hearing if he or it does not like the agency's conclusion that no law has been violated. The Constitution does not require law enforcement agencies to be mired in a formal hearing to defend every decision as to how much investigation is warranted by a given complaint.

nobscot offers no support for its long-run efficiency contention other than the "suggest[ion]" of its "intuition." Nor does it offer any guidance as to what interests are sufficiently "important" to require an evidentiary hearing. It is enough for us here to conclude, after weighing all three *Eldridge* factors, that the due process clause does not require such a hearing in Penobscot's case.

## IV

### Penobscot's Claims on the Merits

#### A. The Exclusive Right Claim Based on Disparate Rates

 Turning to the merits, the FAA did not act arbitrarily or capriciously in dismissing Penobscot's formal complaint. First, Penobscot argues that the FAA erred when it found that Knox County did not violate the Act by granting Downeast Airlines an "exclusive right" to the use of the airport. The "exclusive right" provision of the Act provides that "[a] person does not have an exclusive right to use an air navigation facility on which Government money has been expended." [11] 49 U.S.C. § 40103(e) (1994). Because Knox County has been the recipient of federal funds and property for its airport through various federal aid programs, it is subject to the federal prohibition against the grant of an exclusive right.

 The term "exclusive right" was "intended to describe a power, privilege, or other right excluding or debarring another or others from enjoying or exercising a like power, privilege, or right." *Pompano Beach*, 774 F.2d at 1541 (quoting 40 Op. Att'y Gen. 71, 72 (1941)). "The type of exclusive right prohibited by [this provision of the Act] has been described as one of the sort noxious to

the anti-trust laws." *Id.* at 1542 (internal quotation marks omitted).

The FAA in the present case determined that Knox County had not violated the "exclusive right" provision. Even though the agency recognized that the rental rate charged to Penobscot was not the same as that charged to Downeast, the FAA concluded that the dissimilar lease payments did not rise to the level of a prohibited grant of an exclusive right. Penobscot challenges the FAA's conclusion, contending first that a differential in rental rate is *per se* a violation, and, second, that the disparity here constitutes the grant of an exclusive right. We first consider and reject Penobscot's *per se* violation argument.

 The imposition of disparate rates for comparable premises *may* (but need not) constitute a grant of an exclusive right. Penobscot points to a statement by the FAA itself that "[a]n exclusive right may be conferred either by express agreement, by imposition of unreasonable standards or requirements, or by any other means." [12] FAA Advisory Circular No. 150/5190–2A, at 3 (April 4, 1972); *see also Pompano Beach*, 774 F.2d at 1542. But the word "may" is permissive, not mandatory, so, under this evidence, an airport does not commit a *per se* violation of the "exclusive right" prohibition by charging two different FBOs different lease rates. Thus, the FAA does not regard this kind of disparity as a mandatory violation, and its interpretation is entitled to deference.

Moreover, the FAA Circular speaks of "unreasonable standards or requirements." This implies not only that *de minimis* disparities would not constitute violations, but also that a disparity must rise to some level of

---

**11.** Another section of the Act requires airports receiving federal funding to provide assurances that they "will be available for public use on reasonable conditions and without unjust discrimination." 49 U.S.C. § 47107(a)(1) (1994); *see also* 49 U.S.C. § 47107(a)(5) ("[F]ixed-base operators similarly using the airport will be subject to the same charges."). Additionally, the prohibitions against granting an exclusive right and against unjust discrimination have been incorporated into Knox County's deed (through which the airport was transferred from the federal government to Knox County), by means of a

restrictive covenant. For ease of reference, we will refer to all these sources of potential rights as Penobscot's "exclusive right" claim.

**12.** The FAA's elaboration of the statutory definition is permissible and entitled to *Chevron* deference. Concomitantly, the FAA is bound by its own interpretation of the Act, unless it clearly states that it is deviating from its prior interpretation and articulates a reasonable explanation for the change. *See State Farm*, 463 U.S. at 41–42, 103 S.Ct. 2856.

"unreasonableness" before it may even be considered in the category of non-mandatory "exclusive right" violations. *See Pompano Beach,* 774 F.2d at 1544 ("Key to our affirmance [of the FAA] is the fact that the City's contemporaneous treatment of the [two FBOs] *differed so markedly.*" (Emphasis added.)). Such limitations are a permissible elaboration of the statutory requirement, *see* 49 U.S.C. § 47107(a)(1), (5), and we defer to the FAA's interpretation. Thus, the mere fact that lease payments are not identical does not necessarily constitute "unjust discrimination" in prices or the grant of an "exclusive right."

Having rejected Penobscot's *per se* violation argument, we turn to the facts of the present case. There was no dispute that the rental rates Knox County charged to Penobscot and Downeast were not identical. But on the record before the agency, the FAA determined that these disparate rates did not create an "exclusive right" for any tenant under 49 U.S.C. § 40103(e). The FAA reasoned that Downeast had negotiated its lease seven years earlier than Penobscot, and the circumstances were very different. For seven years, Downeast was the only FBO at the airport, and its "percentage rental rate was intentionally set low by the County to encourage Downeast to service the airport and provide air service." The FAA concluded that Knox County's setting a different rate for Penobscot was consistent with applicable agency guidelines and not in violation of the statute. The FAA's findings of fact on this issue were not seriously contested by Penobscot, and they are in any event amply supported by substantial evidence on the record as a whole. Nor was the FAA's determination arbitrary or capricious or otherwise "not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

Moreover, Penobscot offered no evidence demonstrating that the premises leased by Penobscot and Downeast were comparable.[13] For this reason, Penobscot cannot even establish, as a factual matter, that Knox County charged disparate rental rates for similarly situated premises. Therefore we need not even get to the question whether any dispari-

ty is sufficiently great as to amount to the grant of an "exclusive right." But even if we did, we note that Penobscot has not even addressed the question of whether the difference between a 2.5% rental rate (which Penobscot was charged for its first five years) and a 1.5% rate (which Downeast was charged for its first five years) is large enough to constitute an "unreasonable" or non-*de minimis* disparity.

Nor may Penobscot rely on *Pompano Beach* to buttress its assertion of an "exclusive right" violation. As the FAA concluded, *Pompano Beach* is distinguishable because "[t]here is no evidence to demonstrate that Knox County has taken action to prevent [Penobscot] from providing any aeronautical service that it is permitted to provide under its lease or that [Penobscot] was ever denied access to the airport, as was the off-airport applicant in *Pompano Beach.*" *See Pompano Beach,* 774 F.2d at 1541–45. We note, too, that the *Pompano Beach* court *upheld the FAA's determination* that the disparate treatment was "unjustly discriminatory," concluding that the FAA was "entitled to [so] find." *Id.* at 1543. The court did not reverse the FAA's determination that a disparity was *not* unjustly discriminatory, as Penobscot asks us to do here.

Because of the differences in circumstances between Penobscot and Downeast, the FAA concluded that the rental rate differential did not constitute the grant of "an exclusive right" to Downeast, nor was it unjustly discriminatory. The FAA's determination is neither "arbitrary or capricious" nor otherwise "not in accordance with law."

As an alternative justification for its Final Decision, the FAA points out that "[i]n the context of fees and charges, the FAA will not ordinarily consider a complaint of unjust discrimination brought by a complainant that agreed to the fees through a lease." Penobscot ignores the fact that it negotiated its lease with Knox County and voluntarily agreed to the fees charged. Indeed, Penobscot renegotiated the lease just ten months before it filed its formal complaint here: it proposed an amendment to the lease terms

13. Indeed there is evidence in the record that differences existed as to both size and location.

to address the alleged burden caused by the disparate treatment, and Knox County agreed to that modification. As the FAA put it, Penobscot's "agreement to these new lease terms would itself be sufficient basis under applicable FAA policy to support a finding that the dissimilar lease terms were not unjustly discriminatory and, therefore, did not create a prohibited exclusive right." We agree.

A commercial enterprise like Penobscot cannot negotiate a rental agreement that requires a particular payment rate and schedule, commence doing business and earning profits under that agreement, and then when a balloon payment comes due, complain that the deal was unfair at its inception. In the FAA's words: "the purpose of the grant assurances is to protect the public interest in the operation of Federally obligated airports. The purpose is not to provide alternative or supplemental rights to those normally available to commercial tenants in disputes with their landlords, i.e., negotiation or commercial litigation under applicable state and local laws." We agree with the FAA that Congress did not intend "grant assurances and the FAA compliance process to provide a device by which a commercial aeronautical tenant can abrogate an otherwise valid commercial lease with a sponsor because the operations under the lease are less profitable than the tenant anticipated."

### B. The "Minimum Standards" Claim

The FAA also dismissed Penobscot's second substantive contention: that the airport provided an exclusive right to a second Penobscot competitor, Barnstorm Aviation, by relieving it of the obligation to comply with minimum standards. The FAA found insufficient evidence to support this allegation.

### 1

■■■■ The FAA argues that we have no jurisdiction to consider this claim because Penobscot lacks standing under Article III of the Constitution to raise these claims. We disagree. The FAA is correct, of course, that Article III's standing requirements are jurisdictional. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 118 S.Ct. 1003,

1012–16, 140 L.Ed.2d 210 (1998). Those requirements are three-fold: (1) the plaintiff must have suffered, or be threatened with, an actual injury, (2) traceable to the defendant, and (3) likely to be redressed by a favorable judicial decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Dubois, 102 F.3d at 1281.

The FAA asseverates that Penobscot fails to meet the injury-in-fact requirement because it "has not demonstrated (and cannot, because it's operating at the airport) that [Penobscot] or any other operator has been excluded from the airport because Barnstorm Aviation has been permitted to perform maintenance services without meeting Knox County's minimum standards." Thus, according to the FAA, Penobscot "has suffered no concrete injury by virtue of the FAA's decision regarding Knox County's alleged failure to enforce the 'minimum standards' against various other operators (or by virtue of Knox County's alleged inaction itself)." But the fact that Penobscot is "operating at the airport" and thus has not "been excluded" totally does not mean that it has not suffered any "concrete injury." If Penobscot's costs are higher than those of its competitors—because it has to comply with certain standards that the competitors do not—then its higher costs constitute a concrete injury. See Clinton v. City of New York, —— U.S. ——, ——, 118 S.Ct. 2091, 2100, 141 L.Ed.2d 393 (1998), citing 3 K. Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed.1994).

The FAA also fleetingly argues that it is not clear how the FAA has caused Penobscot's alleged injury, or how a decision in Penobscot's favor would be likely to redress that injury. But again, if Penobscot's higher costs constitute a concrete injury, and the FAA has refused to enforce Penobscot's asserted right to have its competitors subjected to the same minimum standards to which Penobscot is subjected, then the FAA has been, to a sufficient extent, a factor causing the injury. And a favorable outcome in this litigation would redress that injury, at least to a degree sufficient for Penobscot to have standing under Article III. Indeed, the "cau-

sation" factor and the redressability factor are no less applicable to Penobscot's "minimum standards" complaint than they are to its "exclusive right" complaint, and the FAA concedes that Penobscot has standing to raise that issue.

### 2

We may easily dispose of the merits of the "minimum standards" claim. Penobscot alleges that Knox County permitted Barnstorm Aviation to perform commercial aircraft maintenance without a lease and without complying with Knox County's minimum standards, whereas Penobscot was required to comply with all minimum standards.[14] Penobscot states this allegation in conclusory terms, and failed to supply the agency either with specifics or with evidence to support its claim. Therefore the FAA dismissed Penobscot's claim on the ground that it was "unsubstantiated and without supportive documentation to warrant further investigation." That decision was not arbitrary or capricious.[15]

Penobscot asserts that Knox County admitted that it had permitted Barnstorm to perform aircraft maintenance services without obtaining an airport lease. For this reason, it argues that the FAA cannot dismiss Penobscot's claim on the sole ground that Penobscot "did not explain how the County violated its minimum standards." Penobscot's argument is unavailing. The lack of explanation was not the "sole ground" of the FAA's decision but rather was an alternative ground. The FAA rejected Penobscot's assertion that Knox County had admitted the allegation, observing that "[t]he County's ex-

press denial of [Penobscot's] one sentence allegation put the matter at issue, and [Penobscot] did not address it with argument or evidence in its reply." Although Penobscot deemed it unnecessary to "explain how the County violated its minimum standards," the agency thought more details were required. As we will explain, we agree.

The FAA further asserts that Penobscot's allegation is irrelevant, because Penobscot "has not demonstrated (and cannot, because it's operating at the airport) that [Penobscot] or any other operator has been excluded from the airport because Barnstorm Aviation has been permitted to perform maintenance services without meeting Knox County's minimum standards." Penobscot takes issue with the FAA's reasoning, contending, correctly, that a complete denial of access to the airport is not required in order to make out a claim that an exclusive right has been granted. As noted *supra*, Penobscot is correct that courts have found the grant of an exclusive right where a significant burden has been placed on one competitor that is not placed on another.

But Penobscot's reasoning is flawed. It suggests that the FAA had no choice but to pursue its complaint because Knox County did not strictly enforce 100% compliance with all of its minimum standards in every instance. Penobscot had some obligation to flesh out the details of the alleged minimum standards violations and to demonstrate the extent to which those violations impeded its ability to compete on an equal footing at the airport, even if the violations did not completely deny Penobscot access to the airport. This obligation became particularly impor-

---

**14.** Penobscot mentions in passing that other airlines or service providers have been relieved from having to comply with minimum standards, as well as Barnstorm—Downeast Airlines, Knox County Flying Club, and Sky Wagon. But Penobscot's brief fails to argue those cases at all, nor did Penobscot raise such allegations in its administrative appeal. Accordingly, Penobscot has waived its right to judicial review of minimum standards against any entity other than Barnstorm. *See Citizens Awareness Network*, 59 F.3d at 293 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" on appeal.) (internal quotation marks omitted); *Puerto Rico Sun Oil Co.*, 8 F.3d at 81 n. 5

("[A]rgument, summarily stated in a paragraph at the end of [a party's] brief, is not seriously supported and is therefore not preserved for review."); 14 C.F.R. §§ 16.241(e), 16.247(b)(4).

**15.** We note that, on a prior occasion, when Penobscot accused Knox County of failing to require a different FBO to comply with minimum standards, the FAA enforced its requirements and ordered Knox County to hold all competitors to the same set of minimum standards. The difference is that, in that prior case, Penobscot had backed up its allegation with evidentiary support.

tant when the FAA—the law enforcement agency which Penobscot was urging to pursue enforcement action—asked for additional specifics regarding Penobscot's charges, after Knox County stated that it did not permit Barnstorm to violate its minimum standards, that it did its best to prevent any violations, and that for the most part it succeeded. Penobscot utterly failed to meet its burden in this regard, and we find that the FAA acted well within its prosecutorial discretion in declining to pursue Penobscot's complaint any further. Its decision was not arbitrary or capricious.

### Conclusion

Penobscot has no right under the statute or the regulations to an evidentiary hearing on its formal complaint, and the FAA did not abuse its discretion in denying such a hearing on these facts. If applicable, the due process clause entitled Penobscot to no more process than that provided through the FAA's formal complaint procedure followed by the FAA's investigation in this case. Finally, the FAA's dismissal of Penobscot's complaint was grounded on substantial evidence in the record, was not arbitrary or capricious, and did not rest on any errors of law.

Accordingly, we *AFFIRM* the decision of the FAA. Costs on **appeal awarded to the FAA.**