NH v. Blind Vendors                    CV-01-346-M    03/28/03
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


State of New Hampshire,
      Petitioner

      v.                                    Civil No. 01-346-M
                                            Opinion No. 2003 DNH 054
United States Department of
Education; and the New Hampshire
Committee of Blind Vendors
(David Ramsey, John Loveday,
John Toomey, Melinda Conrad,
Wayne Aldrich, Norman Jitras,
Michael Rossi, John Scarlotto
and Martha York),
      Respondents


                        **O R D E R**


      In these consolidated cases (01-346-M and 01-347-JD), the

State of New Hampshire ("the State")[1] and one of the respondents,

the New Hampshire Committee of Blind Vendors ("CBV"), appeal

different parts of a decision rendered by an arbitration panel

convened by the United States Department of Education.  That

panel determined that the New Hampshire Department of

_____

      [1] Originally, these two cases were brought by four different
New Hampshire state agencies.  As explained more fully below, the
State of New Hampshire is now the sole petitioner.  Except where
necessary for clarity, this order attributes the actions of those
agencies to the State collectively.

Administrative Services violated CBV's rights under 23 U.S.C. § 111(b) (hereinafter "§ 111(b)"), by failing to give New Hampshire's blind vendor program a priority to operate vending machines at rest areas along interstate highways within the state.

The State appeals the panel's decision,[2] arguing that: (1) the panel's decision was unlawful, arbitrary, and capricious in several respects; (2) the panel's decision is incompatible with constitutional principles of sovereign immunity and equal protection; and (3) the panel acted beyond its statutory jurisdiction. CBV, in turn, appeals: (1) the panel's calculation of damages (which, incidentally, were made payable not to CBV, but to the state agency that attempted to have the panel's decision and award vacated (Civ. No. 01-347-JD)); and (2) the panel's decision not to award CBV attorneys' fees.

---

[2] While it would be conventional to think of the panel's decision as a decision against the State, in fact the arbitration panel's decision benefitted the state agency that provides services to the blind, albeit at the expense of other state agencies competing for the revenue derived from operating vending machines at interstate highway rest areas.

2

Before the court are: (1) CBV's Motion for Summary Judgment on Enforcement of Arbitration Award (document no. 24), to which the State objects; (2) CBV's Motion for Attorneys' Fees and Costs (document no. 25), to which the State objects; and (3) the State's Motion for Summary Judgment (document no. 26), with which the federal Department of Education agrees in part and disagrees in part, and to which CBV objects. For reasons given below, both motions for summary judgment are granted in part and denied in part. CBV's motion for attorneys' fees is necessarily denied.

**Standard of Review**

While two pending motions are styled as summary judgment motions, the familiar summary judgment standard does not apply because the underlying actions are in fact appeals brought under the provisions of the federal Administrative Procedure Act ("APA"). See 20 U.S.C. § 107d-2(a) (decisions by Department of Education arbitration panels "shall be subject to appeal and review as a final agency action for purposes of chapter 7 of . . . Title 5"); see also Lodge Tower Condo. Ass'n v. Lodge Properties, Inc., 880 F. Supp. 1370, 1374 (D. Colo. 1995), aff'd, 85 F.3d 476 (10th Cir. 1996) ("[b]ecause a district court's

3

function in reviewing administrative action is different from the function it usually performs as a trier of fact . . . a motion for summary judgment under rule 56 of the Federal Rules of Civil Procedure . . . makes no sense when a district court is asked to undertake judicial review of administrative action); Environment Now! v. Espy, 877 F. Supp. 1397, 1421 (E.D. Cal. 1994) ("When the court reviews an agency decision, the standard for summary judgment is modified by 5 U.S.C. § 706(2). The question is not whether there is a genuine issue of material fact, but rather whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or not supported by substantial evidence on the record taken as a whole.") (citation omitted).

Both parties agree that as an appeal of an agency's administrative action, this matter is appropriate for resolution without trial. The pertinent standard of review is found in the APA, which provides, in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or

applicability of the terms of an agency action. The reviewing court shall–

. . .

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be–
    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    **(B)** contrary to constitutional right, power, privilege, or immunity;
    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

. . .

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute.

5 U.S.C. § 706 (1996).

## Legal Background

A. <u>Vending Machines on Interstate Highways</u>

From the time Title 23 of the United States Code was recodified in 1958 until 1983, 23 U.S.C. § 111 provided:

All agreements between the Secretary [of the United States Department of Transportation] and the State highway department for the construction of

5

> projects on the Interstate System shall contain a clause providing that . . . the State will not permit automotive service stations or other commercial establishments for serving motor vehicle users to be constructed or located on the rights-of-way of the Interstate System.

Pub. L. No. 85-767, 72 Stat. 885, 895 (1958).  In 1983, that restriction was modified.  The Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, 96 Stat. 2097, 2106 (1983), added the following provision to § 111:

> Notwithstanding subsection (a), <u>any State may permit the placement of vending machines in rest and recreation areas, and in safety rest areas</u>, constructed or located on rights-of-way of the Interstate System in such State. . . .  In permitting the placement of vending machines, <u>the State shall give priority to vending machines which are operated through the State licensing agency designated pursuant to section 2(a)(5) of the Act of June 20, 1936, commonly known as the "Randolph-Sheppard Act" (20 U.S.C. 107a(a)(5))</u>.

23 U.S.C. § 111(b) (emphasis supplied).  While § 111(b) directs states to give priority to "vending <u>machines</u>" operated "<u>through</u> the State licensing agency" ("SLA"), neither that section nor the remainder of chapter 1 of Title 23 details the procedure SLAs, or those operating machines through the SLA, can use to vindicate the rights created by § 111(b).

Shortly after Congress allowed states to place vending machines in rest areas along interstate highways, the State of New Hampshire enacted legislation designed to take advantage of that opportunity. See N.H. REV. STAT. ANN. ("RSA") § 230:30-a (Supp. 2002). However, the State did not have only the interests of blind vendors at heart. New Hampshire's statute provides, in part, that "[n]otwithstanding the provisions of RSA 186-B:9-15 [which gives blind persons the right to operate vending facilities on state property], any bidder shall be eligible to bid for this service. . . ." RSA 230:30-a, II (Supp. 2002). When the statute was first enacted, it prohibited "the director of plant and property management . . . [from] incur[ring] any capital expense to the state of New Hampshire." RSA 230:30-a, III (1993). The statute also directed that "the state's share of the funds derived from the vending machine revenue shall be deposited as unrestricted revenue in the general fund." RSA 230:30-a, V (1993) (emphasis added).

In 1998, the statute was amended to allow "[t]he commissioner of the department of transportation [to] incur capital expenses for the erection of new facilities to house

7

vending machines."  RSA 230:30-a, III-a (Supp. 2000).  The amendment also provided that "[t]he state's share of the funds derived from the vending machine revenue shall be apportioned as follows: 75 percent to the general fund, and 25 percent to the department of transportation beginning July 1, 1999."  RSA 230:30-a, IV (Supp. 2002) (emphasis added).  Missing from the State's implementing legislation was any mention of the SLA, or any mention of the priority federal law required to be given to vending machines operated "through the SLA."

B.    Vending Opportunities for the Blind

Since 1936, the Randolph-Sheppard Act has "provid[ed] blind persons with remunerative employment, enlarg[ed] the economic opportunities of the blind, and stimulat[ed] the blind to greater efforts in striving to make themselves self-supporting" by authorizing licensed blind persons "to operate vending facilities on any Federal property."  20 U.S.C. § 107(a).  Congress's continuing efforts to strengthen Randolph-Sheppard have been explained as follows:

> The special solicitude shown by Congress for the blind
> has been so long, so constant, and so pointed that it
> must be seen as manifesting a congressional conviction

that the federal government has, in the words of yet
another statute, "special federal responsibilities" to
the blind. See Vocational Rehabilitation Act of 1973,
Title III, 87 Stat. 377. Within its general interest
in preventing unemployment, Congress has a particular
interest in providing for the employment of the blind.

Jacobsen v. U.S. Postal Serv., 812 F.2d 1151, 1153 (9th Cir.

1987).


The Act establishes a joint federal/state program in which

voluntarily participating states are responsible for licensing

blind persons to operate vending facilities on federal property.

See 20 U.S.C. §§ 107a(a)(5) and 107a(b). That licensing

function, and a variety of other activities designed to benefit

blind persons, are performed by a participating state's SLA. See

20 U.S.C. §§ 107b and 107b-1. When a state chooses to

participate in the program, it undertakes to meet the following

requirements:

A State agency for the blind or other State agency
desiring to be designated as the licensing agency
shall, with the approval of the chief executive of the
State, make application to the Secretary [of the United
States Department of Education] and agree-

**(1)** to cooperate with the Secretary in carrying
out the purpose of this chapter;

. . .

**(6)** to provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending facility program an opportunity for a fair hearing, and to <u>agree to submit the grievances of any blind licensee not otherwise resolved by such hearing to arbitration as provided in section 107d-1 of this title.</u>

20 U.S.C. § 107b (emphasis added).  In addition to providing blind persons with an opportunity to operate vending facilities on federal property, the Act also insures that, if vending machines are operated on federal property by persons other than blind licensees, the resulting "vending machine income . . . shall accrue . . . to the State agency in whose State the Federal property is located, for the uses designated in subsection (c) of this section. . . ."  20 U.S.C. § 107d-3(a).  Those uses include pension plans, health insurance, and payment for sick leave and vacation time, as well as purchase, maintenance, and replacement of equipment, management services, and subsidies to assure a fair minimum return for operations.  <u>See</u> 28 U.S.C. § 107d-3(c); 107b(3)(A)-(D).

10

In New Hampshire, blind persons enjoy not only the benefits provided by the Randolph-Sheppard Act, but also analogous benefits conferred by state law. RSA 186-B:9-15 (1999). In essence, that statute affords blind persons vending opportunities on state property similar to the opportunities afforded by Randolph-Sheppard with respect to federal property.

C.    The Interplay Between 23 U.S.C. § 111(b) and the Randolph-Sheppard Act

Shortly after the enactment of § 111(b), on March 11, 1983, the Federal Highway Administration issued a memorandum "to provide guidance in the implementation of Section 111 of the Surface Transportation Assistance Act (STAA) of 1982 as it relates to the installation of vending machines in Interstate Highway System rest areas." That memorandum stated, in part:

> 3.    The State highway agency need not operate the vending machines directly. It may enter into contracts with vendors for the installation, operation, and maintenance of such vending machines. All States, including those which are participating in the 1978 vending machine demonstration project, must give priority to vending machines operated through the State licensing agency designated pursuant to the Randolph-Sheppard Act. . . .
>
> . . .

11

5.    Documentation demonstrating a positive initiative to involve the designated Randolph-Sheppard Act State agency will be required before the State highway agency proposes alternate organizations or corporations to operate the vending machines. However, if the designated Randolph-Sheppard Act agency waives its rights in writing, the State highway agency is free to negotiate agreements described in "3" above with any organization or corporation.

(Respondent's Mem. of Law, Ex. M.)  A follow-up memorandum, dated March 13, 1984, provides as follows:

3.    There has been some question as to the extent the Randolph-Shepard Act . . . requirements apply to Section 111.  The only application the [Act] has to Section 111 is to establish the licensing agency in each State that is to be given priority. With the [Randolph-Sheppard] exception of rest areas on Federal lands, which is discussed in the next paragraphs, none of the requirements apply to vending machines in Interstate rest areas.

(Respondent's Mem. of Law, Ex. J.)  The 1984 memorandum was issued shortly after the Comptroller General of the United States issued an opinion letter in which he concluded that "State income derived from vending machines at rest areas along interstate highways is not limited by 20 U.S.C. § 107d-3 of the Randolph-Sheppard Act."  (Respondent's Mem. of Law, Ex. K.)

12

**Factual Background**

New Hampshire participates in the program established by the Randolph-Sheppard Act. The New Hampshire Department of Education, Division of Vocational Rehabilitation, Bureau of Blind Services serves as New Hampshire's SLA. Given the enactment of 23 U.S.C. § 111(b), the State chose to permit vending machines at rest areas along interstate highways in New Hampshire. The New Hampshire Department of Administrative Services is charged with implementing that choice, and has selected vendors, using a competitive bidding process. RSA 230:30-a, II. One of the key criteria used to evaluate bids is the commission rate prospective vendors are willing to pay the State to operate the machines. The State purports to give vending machines operated "through the SLA" a priority in the following way: if the two highest bids received on a vending machine contract are identical, and one of the two bidders is the SLA, then the SLA will be awarded the contract.

In 1988, the Administrative Services Department invited bids on a contract for vending machine services at the Hooksett rest areas on Interstate 93. The contract term was seven years, with

13

an option for one five-year renewal.  The SLA was given the opportunity to bid on that contract, but declined to do so, apparently because the contract specifications called for the successful bidder to construct the shelters in which the vending machines were to be housed, and state law precluded the SLA from making capital expenditures,[3] (Hr'g Tr., Jan. 11, 2001, at 102.) The contract was eventually awarded to C.C. Vending, Inc.  C.C. Vending agreed to pay a commission to the State of 15.91 percent of gross receipts.  The contract's term ran from June 2, 1988, through June 1, 2000, but was later extended through June 30, 2001.

On August 8, 1991, the State entered into a similar agreement with C.C. Vending.  Under that contract, C.C. Vending constructed three vending facilities at rest areas along Interstate 95 in Seabrook, Interstate 93 in Salem, and Interstate 89 in Springfield and will pay the State a commission of 17.76 percent of gross vending receipts through August 7, 2003.  As

---

[3] In a letter dated July 29, 1988, to the Commissioner of Administrative Services, the Vending Stand Program Coordinator (in the State Department of Education's Bureau of Blind Services) stated that he "would like to have seen Blind Services operate that vending service [at the Hooksett rest areas], but the bid specifications were more than we could handle."

with the Hooksett contract, the SLA did not bid, apparently for the same reasons.

During the arbitration hearing, a witness employed by Administrative Services, Michael Connor, testified that the SLA had waived, in writing, its right to a priority at the Springfield rest area. Another witness, Pamela Bartlett of the SLA, recalled no such waiver. The written waiver to which Conner referred does not appear to have been included in the administrative record. It also appears from the testimony given at the hearing that any waivers related to the Seabrook, Salem, and Springfield contracts were given as a result of negotiations between the SLA and Administrative Services. The SLA waived its priority in exchange for a share of the commissions the State received from the successful bidder.[4]

In 1997, Administrative Services invited bids on a two-year contract for vending machine services at interstate highway rest areas in Lebanon, Canterbury, Sanbornton, and Sutton. Unlike the

---

[4] The Attorney General later determined that it would be unlawful, under state law, for a portion of the vending machine proceeds to be turned over to the SLA.

1988 and 1991 contracts, the specifications for the 1997 contract did not require the successful bidder to construct vending shelters, but only to undertake some relatively minor electrical and plumbing work. The contract specifications called for "a limited number of vending machines [to be] placed in the four rest area buildings where space is available."

Five bids were submitted, including one from the SLA. C.C. Vending offered to pay the highest commission – $3,500 per month over the contract term, for a total of $84,000 – and was awarded the contract. The term ran from March 19, 1997, through March 31, 1999. The SLA's bid, second lowest of the five, offered only $300 per month, for a total of $7,200.

In 1999, Administrative Services invited bids on a five-year contract for vending services at the same four rest areas, Lebanon, Canterbury, Sanbornton, and Sutton. Like the previous contract, this one called for no construction by the successful bidder. The specifications for vending facilities were as follows:

16

> Under the terms of the contract, a limited number of
> vending machines will be placed in the four existing
> rest area buildings from April 1, 1999 until October
> 31, 1999. On November 1, 1999, through March 31, 2004,
> the Contractor shall place and service a total of
> twenty four (24) vending machines in newly constructed
> vending facilities built by Department of
> Transportation.

Five bids were received (one of which was subsequently withdrawn), including a bid from the SLA. The contract was awarded to Good Morning Sales, Inc. Good Morning Sales offered to pay the State $283,557 over the life of the contract, which became effective on March 24, 1999, and runs through March 31, 2004. The SLA's bid, lowest of the four that were considered, offered to pay only $32,650.

In 2001, Administrative Services invited bids for vending machine services at the Hooksett rest areas, to be provided in new shelters built by the Department of Transportation. After selecting a vendor, presumably the high bidder, the State offered the contract to the SLA on the same terms offered by the successful bidder. The SLA, after consulting with CBV, declined that opportunity.

17

Based upon the foregoing, it would appear that: (1) vending services at the Hooksett rest areas are being provided under a contract of unknown duration awarded in 2001; (2) vending services at the Seabrook, Salem, and Springfield rest areas are being provided by C.C. Vending under a contract due to expire on August 7, 2003; and (3) vending services at the Lebanon, Canterbury, Sanbornton, and Sutton rest areas are being provided by Good Morning Sales under a contract due to expire on March 31, 2004.

An affidavit by Michael Conner, submitted to the arbitration panel by the State, suggests that the State was paid a total of $906,725.29 in commissions by vendors operating machines at interstate highway rest areas from October 28, 1998, through June 20, 2002.[5] According to a table submitted by CBV, the State's income from vending machines at interstate highway rest areas, from 1989 through 2000, totals $1,820,718.02.[6]

---

[5] That figure includes $15,525 in commissions earned from a rest area in Nashua, but because no interstate highway passes through Nashua, the Nashua rest area commissions are not relevant to this case.

[6] The CBV table does not include commission income generated by vending machines at the Nashua rest area.

## Procedural History

By complaint dated January 6, 1998, CBV filed suit in this court (Civ. No. 98-011-M), claiming that the State failed to give a priority to vending machines operated through the SLA when it awarded contracts for the operation of vending machines in rest areas along interstate highways in New Hampshire. CBV sought "an injunction ordering the State of New Hampshire to grant the right to operate vending machines on Interstate Highways to Blind Vendors licensed by the State licensing agency and that all existing vending machine contracts are void as a matter of law."

Rather than defend on the merits, the State moved to dismiss on grounds that: (1) this court lacked subject matter jurisdiction, due to CBV's failure to exhaust available administrative remedies; and (2) this court should stay or dismiss the case, under the <u>Colorado River</u> abstention doctrine, due to CBV's having simultaneously filed an identical action against the State in the New Hampshire Superior Court.

19

With respect to its argument that CBV was required to exhaust available administrative remedies, the State made its position very plain:

> Plaintiff has failed to exhaust its administrative remedies. Thus, Plaintiff's claim should be dismissed.
>
> . . .
>
> The right that Plaintiff seeks to enforce in this action arises under the Randolph-Sheppard Act by incorporation of a portion of the Randolph-Sheppard Act in 23 U.S.C. § 111(b).
>
> The Randolph-Sheppard Act "sets forth a grievance procedure for blind vendors." Committee of Blind Vendors [v. District of Columbia], 28 F.3d [130,] 131 [(D.C. Cir. 1994)]. "Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program" can request a full evidentiary hearing before his State Licensing Agency. 20 U.S.C. § 107d-1. If dissatisfied with the result of the hearing, the blind vendor can file a complaint with the Secretary of the United States Department of Education, who then convenes an ad hoc arbitration panel to address the grievance. Id. "The arbitration panel's decision is binding and subject to judicial review as final agency action under the Administrative Procedure Act." Committee of Blind Vendors, 28 F.3d at 131, 20 U.S.C. § [107d-2(a)].
>
> . . .
>
> Plaintiff has filed suit without having exhausted its administrative remedies. Plaintiff's claim should, accordingly, be dismissed under FRCP Rule 12(b)(1) for lack of subject matter jurisdiction.

20

(Mem. of Law in Support of State's Mot. to Dismiss in Civ. No. 98-011-M, at 2-3.)  While arguing that CBV was obligated to exhaust its administrative remedies before filing suit here, DAS's motion to dismiss also contained the following footnote:

> Defendant does not agree that the Randolph-Sheppard Act in general applies to the facts of this case nor that, to the extent that it does apply, that it gives Petitioner the rights claimed.  However, for purposes of this Motion to Dismiss only, it is assumed that Petitioner's allegation that the Randolph-Sheppard Act applies will be accepted as true.[7]

(Id. at 3, n.1.)  Finally, as part of its Colorado River abstention discussion, the State argued:

> Part of the relief which the Plaintiff seeks is termination of contractual rights between the State and third parties.  The State has not and does not waive its immunity to suit in federal court under the Eleventh Amendment of the United States Constitution in regards to suits involving contractual rights.  Therefore, only in the state court action can all of the issues raised by this pleading be addressed.

(Id. at 5 (emphasis added).)  The State's exhaustion argument proved successful; Civ. No. 98-011-M was dismissed, without

---

[7] In fact, CBV did not assert that the Randolph-Sheppard Act applied to its claim – CBV insisted that its claims were firmly based on § 111(b).

21

prejudice, based upon CBV's failure to exhaust administrative remedies.

As demanded by the State, CBV pursued the administrative remedies outlined in the Randolph-Sheppard Act. By letter dated March 30, 1998, CBV requested a full evidentiary hearing, under the provisions of 20 U.S.C. § 107d-1 (a). The State appeared and fully participated, without invoking Eleventh Amendment immunity. In a decision dated July 3, 1998, a New Hampshire Department of Education Hearings Officer granted the State's motion to dismiss CBV's administrative action, on grounds that the priority extended by § 111(b) did not apply to land owned by the State and that the rest areas at issue here are located on state land rather than federal property. In essence, the Hearings Officer granted the equivalent of a 12(b)(6) dismissal.

CBV then pursued the administrative process further, by filing a complaint with the Secretary of the United States Department of Education, also under the provisions of 20 U.S.C. § 107d-1(a).[8] Pursuant to 20 U.S.C. § 107d-2(a), the Secretary

_____

[8] The precise date of that complaint is somewhat illusive. It was dated October 19, 1998, by CBV's attorney, and date-

22

convened an arbitration panel. The arbitrators twice ruled in CBV's favor, first by denying the State's motion to dismiss for lack of jurisdiction,[9] and then by granting CBV relief on the merits. On the merits, the arbitration panel ruled that: (1) RSA 230:30-a, II, is pre-empted by 23 U.S.C. § 111(b), under the Supremacy Clause, U.S. CONST. art. VI, cl.2; (2) under § 111(b), the SLA is entitled to "receive an opportunity to operate vending machines <u>before</u> any private vendor is even <u>pursued</u>"; and (3) "the Blind Vendors are entitled to damages in the amount of full commissions payable, <u>prospectively</u>, from the time of asserting this claim on October 28, 1998 . . . to the New Hampshire SLA for the appropriate uses benefitting Blind Vendors." The arbitrators denied CBV's request for attorneys' fees.[10]

---

stamped October 23, presumably by the federal Department of Education. In the first of two decisions rendered by the federal arbitration panel, the filing date of the complaint is given as October 20, 1998, while in its second decision, the panel awarded damages "from the time of asserting this claim on October 28, 1998."

[9] The State argued that the arbitration panel had no jurisdiction over CBV's complaint because: (1) CBV's underlying grievance did not concern any act by the SLA; and (2) the Randolph-Sheppard Act is inapplicable because the rest areas in question are on state rather than federal land.

[10] The panel's decision is supplemented by extensive findings of fact and rulings of law, in the administrative record.

Following the arbitrators' decision, two suits were filed in this court. One was filed by the State Department of Education, acting as the State's SLA (Civ. No. 01-347-JD). The other was filed by three executive-branch state agencies: the Department of Administrative Services, the Department of Transportation, and the State Treasurer (Civ. No. 01-346-M). Both suits are brought as appeals from the decision of the federal arbitration panel, as authorized by 20 U.S.C. § 107d-2(a). As a consequence, the federal Department of Education is named as a respondent, along with CBV, in both suits.[11] By order dated January 16, 2002, the suits were consolidated. By order dated May 16, 2002, the court granted the federal respondent's motion to dismiss three of the four original petitioners. Subsequently, the court granted the State of New Hampshire's motion to be substituted as the real party in interest.

In the complaint filed in Civ. No. 01-347-JD, the SLA contended that the arbitration panel's decision was unlawful, see

---

[11] In its Memorandum in Support of the State of New Hampshire's Motion for Summary Judgment, the federal Department of Education joins with the State in arguing that New Hampshire was protected from arbitration by the Eleventh Amendment, but fully supports CBV on all other points.

24

5 U.S.C. § 706(2)(A), because the panel: (1) erroneously construed the term "priority" in 23 U.S.C. § 111(b) by holding the State to requirements established under the Randolph-Sheppard Act, which are inapplicable to interstate highway rest areas located on state rather than federal land; (2) lacked jurisdiction to decide the issues raised by CBV, because the pertinent rest areas are located on state rather than federal property; (3) wrongly decided that RSA 230:30-a, II, was preempted by federal law, because there is no conflict between state law and applicable federal statutes; and (4) had no authority to award monetary relief.[12]

In the Petition for Declaratory Relief and [Interim] Injunctive Relief from Final Agency Action filed in Civ. No. 01-346-M, the State Administrative Services Department, Department of Transportation, and State Treasurer contended that the arbitration panel's decision was arbitrary, capricious, and unlawful, see 5 U.S.C. § 706(2)(A), because the panel: (1) misconstrued the term "priority" as it is used in § 111(b);

_____

[12] Interestingly, in its complaint, New Hampshire's SLA asked the court to vacate an arbitration award under which the SLA itself – rather than CBV – stood to recover at least several hundred thousand dollars.

25

(2) failed to recognize that rest areas on the F.E. Everett Turnpike and the Blue Star Turnpike are not subject to 23 U.S.C. § 111(b); (3) misconstrued the term "right of first refusal;" (4) erroneously concluded that RSA 230:30-a conflicts with 23 U.S.C. § 111(b); and (5) had no authority to award monetary relief.

The petition further contended that the panel's decision was unconstitutional, see 5 U.S.C. § 706(2)(B), because: (1) the Eleventh Amendment precludes both the jurisdiction of a federal arbitration panel over the State and the award of money damages against the State; and (2) the Fourteenth Amendment equal protection clause prohibits the priority given to blind licensees by both the Randolph-Sheppard Act and 23 U.S.C. § 111(b). Finally, the State contended that the panel exceeded its statutory authority, see 5 U.S.C. § 706(2)(C), because: (1) 23 U.S.C. § 111(b) does not (contrary to the State's earlier position) incorporate the arbitration provisions of the Randolph-Sheppard Act, thus the panel had no jurisdiction to hear CBV's case; (2) federal arbitration panels have no authority to declare state laws invalid; (3) the panel had no authority to: (a)

26

interpret 23 U.S.C. 111(b) (by reading parts of the Randolph-Sheppard Act into that statute (as the State itself had done in earlier litigation), or in any other way); or (b) decide a grievance based upon state law; and (4) the panel had no authority to award money damages, which may be available under the Randolph-Sheppard Act, but are not available under 23 U.S.C. § 111(b).

For its part, CBV answered both the complaint in Civ. No. 01-347-JD and the petition in Civ. No. 01-346-M by denying the State's claims and by asserting a four-count "counterclaim" that included: (1) a "Notice to Modify Arbitration Order Insofar As Date By Which Damages Are To Be Calculated," which claims January 6, 1998, rather than October 28, 1998, as the date on which it initiated its action against the State; (2) an "Appeal of Arbitration Award Regarding Damages," which requested that damages be awarded from 1985, when RSA 230:30-a was enacted; (3) an "Appeal of Arbitration Award Regarding Attorneys' Fees;" and (4) a request for confirmation of the arbitration award, notwithstanding the modifications sought in Counts I, II, and III.

27

**Discussion**

In its motion for summary judgment, the State argues that: (1) the Eleventh Amendment immunizes it from claims brought under 23 U.S.C. § 111(b), whether brought before an arbitration panel or in this court; (2) 23 U.S.C. § 111(b) does not preempt RSA 230:30-a; (3) the arbitration panel's award of damages was in excess of the panel's statutory authority and unsupported by substantial evidence; and (4) 23 U.S.C. § 111(b) violates the Equal Protection Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

CBV, in its Motion for Summary Judgment on Enforcement of Arbitration Award, argues that: (1) the arbitration panel correctly construed the term "priority" as used in 23 U.S.C. § 111(b); (2) the State has waived any argument that § 111(b) does not apply to turnpikes and toll roads, but even if that argument has not been waived, § 111(b) applies to all rest areas on the interstate highway system, including those portions of the system on which the state collects tolls, even when those rest areas are located on state property; (3) RSA 230:30-a is pre-empted by § 111(b) because the competitive bidding process

28

required by the New Hampshire statute conflicts with the federal statutory requirement that blind vendors be given a priority; (4) abundant case law establishes that federal arbitration panels convened under the Randolph-Sheppard Act have the authority to award money damages, notwithstanding the Eleventh Amendment; (5) the State waived its claim to sovereign immunity by voluntarily consenting to suit under the Act and by voluntarily invoking federal court jurisdiction; and (6) CBV is entitled to damages from January 6, 1998, the date on which it first filed suit against the State, rather than October 28, 1998, the date on which CBV filed its arbitration complaint with the federal Department of Education.

For its part, the federal respondent agrees that the State is immune from liability on CBV's claims because Congress did not effectively abrogate its Eleventh Amendment immunity. But, the federal respondent goes on to say that if sovereign immunity does not apply, then: (1) the arbitration panel correctly ruled that the State violated § 111(b) by failing to give a priority to vending machines operated through the SLA; (2) contrary to the State's position, § 111(b) applies to all rest areas located on

29

the interstate highway system, not just those for which New Hampshire has accepted federal funds; and (3) § 111(b) does not violate the equal protection guarantees of the Fifth Amendment to the United States Constitution.

While this case has become remarkably complicated (due in no small measure to the State's attempted change of position on the issue of jurisdiction), there appear to be four principal issues: (1) whether the State was subject to the Randolph-Sheppard Act administrative remedies it insisted be followed; (2) whether the State waived any Eleventh Amendment immunity it might have enjoyed; (3) whether the arbitration panel properly defined "priority" and calculated damages; and (4) whether the statutory preference given blind vendors in 23 U.S.C. § 111(b) is unconstitutional.

For reasons given extensively below, the court rules that: (1) CBV's complaint was properly considered in the administrative process established by 20 U.S.C. § 107d-1(a); (2) the State waived its Eleventh Amendment immunity in this matter by its litigation conduct; (3) the arbitration panel's construction of

the term "priority" is supportable, but it slightly miscalculated the proper measure of damages; and (4) the State has forfeited its equal protection challenge to § 111(b), but even if it had not done so, its equal protection argument is without merit.

A.    <u>Jurisdiction</u>

According to the State, the State hearing examiner and the federal arbitration panel had no jurisdiction over CBV's complaint for at least two reasons: (1) all the interstate highway rest areas at issue are located on state property; and (2) CBV's underlying complaint was brought against the State Department of Administrative Services, and not the SLA. The State hearing examiner, of course, ruled in favor of the State, dismissing CBV's complaint. On appeal, however, the arbitration panel denied the State's motion to dismiss and reached the merits of the complaint. Consequently, the State appears to be asking the court either to set aside the arbitration panel's denial of its motion to dismiss, or set aside the arbitration panel's decision on the merits. The State says that in denying its motion to dismiss, and reaching the merits of CBV's complaint,

the arbitration panel acted "in excess of statutory jurisdiction [and] authority." 5 U.S.C. § 706(2)(C).

The problem with the State's position is that it ignores this court's order on the motion to dismiss filed by the State in Civ. No. 98-011-M. In that case, the State asserted – and the court agreed – that CBV was precluded from filing suit before it exhausted the administrative remedies available under 20 U.S.C. § 107d-1(a). The State not only insisted that the various administrative decision-makers described in § 107d-1(a) had jurisdiction to determine whether CBV was denied the priority it claimed under 111(b), but it obtained a judgment to that effect – and neither party appealed that judgment. The State certainly understood, when it moved to dismiss Civ. No. 98-011-M for failure to exhaust, that the rest areas in question were located on state property and that CBV's complaint involved the State's failure to extend the § 111(b) priority. Yet, the State still insisted that CBV was obligated to pursue the administrative remedies provided for in 20 U.S.C. § 107d-1(a). The arbitration panel did not exceed its statutory jurisdiction or authority by reaching the merits of CBV's complaint, because this court – at

32

the State's request – construed 111(b) as incorporating the administrative grievance procedures outlined in the Randolph-Sheppard Act, at least as far as this dispute is concerned, and both parties actively participated in that process. See Faigin v. Kelly, 184 F.3d 67, 82 (1st Cir. 1999) (citations and internal quotations marks omitted) (explaining that "the doctrine of judicial estoppel precludes parties in civil litigation from asserting legal or factual positions inconsistent with the positions that they took in prior proceedings . . . when the party to be estopped had succeeded previously with a position directly inconsistent with the one [he] currently espouses").

B.    Sovereign Immunity

The State insisted, in the earlier case, that blind vendors dissatisfied with its administration of priority rights, required by § 111(b) to be extended to vending machines operated "through" the State licensing agency, must seek redress under the remedial system established by the Randolph-Sheppard Act. It did so by arguing that § 111(b) incorporated the dispute resolution procedures outlined in Randolph-Sheppard, a proposition advanced exclusively by the State and explicitly opposed by CBV. The

33

court accepted the State's analysis - that the § 111(b) priority was intended by Congress to extend the scope of privileges provided to licensed blind vendors under the Randolph-Sheppard Act, by creating a comparable priority for blind vendors operating "through" the State licensing agency with regard to any vending machines the State might choose to operate at rest areas adjacent to, and within the right-of-way of, the interstate highway system.

Although the discrete legal point might have been argued differently - i.e., the State might have argued plausibly that the § 111(b) priority is free-standing, unrelated to Randolph-Sheppard, not subject to enforcement through Randolph-Sheppard administrative remedies, was not intended to provide blind vendors with any private right of action should a state ignore its mandate, and is enforceable, if at all, only through action of the Secretary of Transportation against the State (i.e., by withholding federal highway funds from New Hampshire) - the State did not take such a position. To the contrary, New Hampshire argued, successfully, that it thought the § 111(b) priority dispute was properly addressed only in the context of Randolph-

34

Sheppard's overall purposes and under its remedies. Given that the specific description of the vending priority provided for in § 111(b) is one unmistakably intended to benefit "machines" operated "through" the State licensing agency established under Randolph-Sheppard, and that machines so operated either benefit licensed blind vendors directly or indirectly benefit the blind vending program, it was certainly reasonable for the State to advance that construction of the legal interrelationship between the § 111(b) priority and the Randolph-Sheppard Act.

In any event, the controlling issue in this case is not whether the State's position in the earlier litigation was or was not correct. The State's asserted legal theory prevailed, the court ruled in its favor, and no appeal was taken by either the CBV or the State from the final judgment entered in that case. The parties, to the contrary, proceeded to comply with that judgment by pursuing the Randolph-Sheppard Act administrative remedies relative to CBV's complaints of non-compliance by the State with the priority mandate of § 111(b).

During the initial administrative hearing, the State appeared without reservation and participated fully, arguing that CBV's complaint should be dismissed, on the somewhat dubious proposition that the § 111(b) priority did not apply to vending machines operated at rest areas adjacent to and within the federal right-of-way of interstate highways where title to the underlying real estate (the rest area property) was held in the name of the State.

The Hearings Officer accepted that argument and dismissed CBV's complaint.  But, CBV took the next step available to it under the administrative scheme, and appealed that decision to the United States Department of Education.  The Department convened an arbitration panel to hear the appeal (as provided in 20 U.S.C. §§ 107d-1(a) and 107d-2).

Once again, at stage two of the administrative process, the very process the State insisted upon, the State appeared and participated fully.  It did mention "sovereign immunity" before the arbitration panel, but in a very limited context.  It did not argue that it was immune, under the Eleventh Amendment, from

36

being haled before the federal arbitration panel that it earlier

insisted upon, but suggested only that in enacting § 111(b),

Congress did not abrogate the State's sovereign immunity.  And,

after suffering an adverse ruling by the arbitration panel, the

State voluntarily invoked the next step available under the

administrative scheme - it filed suit in this court, seeking an

appeal from the arbitration panel's adverse administrative

decision, as provided for in 20 U.S.C. § 107d-2(a).


Now the State argues, apparently, that it has all been a

rather large oversight; that it has never been subject to either

the federal administrative remedies provided for under Randolph-

Sheppard with regard to § 111(b) claims, or to federal court

jurisdiction, because it is immune under the Eleventh

Amendment.[13]  The State argues that its Eleventh Amendment

---

[13] Contrary to the State's current claim - that it "has repeatedly raised the defense of sovereign immunity" - it in fact has not invoked its Eleventh Amendment protection.  The State has referenced sovereign immunity as follows.  In Civ. No. 98-011-M, the State mentioned sovereign immunity in the context of arguing for Colorado River abstention.  Before the New Hampshire Department of Education Hearings Officer, the State did not mention sovereign immunity at all.  In a motion to dismiss for lack of jurisdiction, before the federal arbitration panel, the State devoted two sentences to sovereign immunity, arguing that Congressional enactment of § 111(b) did not entail the abrogation of state sovereign immunity by Congress.  The State did not

37

immunity has never been abrogated by Congress, and that it has never expressly or impliedly waived its Eleventh Amendment immunity with regard to claims brought under the § 111(b) priority provision.  The Department of Justice agrees with the State, on that point only, but quickly asserts that absent a sovereign immunity defense, the State is certainly liable for what amounts to stealing from the blind.

The State may or may not be correct in asserting that Congress, in enacting the § 111(b) priority requirement, did not intend to abrogate states' Eleventh Amendment protections.  It may well be that Congress did not intend to bring § 111(b) claims within the immunity waiver associated with a state's participation in the Randolph-Sheppard Act vending facility program.  See, e.g., Premo v. Martin, 119 F.3d 764, 771 (9th Cir. 1997) ("The evidence that Congress conditioned State participation in the Randolph-Sheppard program on federal

_____

mention sovereign immunity at all in its request for rulings of law submitted to the arbitration panel.  In Count II of the petition the State filed to initiate this case, the State asserted that sovereign immunity precluded the arbitration panel's award of money damages and precluded the panel's jurisdiction over it – an argument never pressed before the panel itself.

38

judicial enforcement of compensatory awards is overwhelming.");
Del. Dep't of Health & Soc. Servs. v. U.S. Dep't of Educ., 772
F.2d 1123, 1137-38 (3rd Cir. 1985) ("Delaware, by applying to
participate in the Randolph-Sheppard program has agreed to the
remedies which that program requires.").  What little legislative
history the court has been able to find is inconclusive, and the
parties offer nothing more enlightening.

On the other hand, a plausible argument could be made that
by choosing to participate in the interstate highway rest area
vending machine program created by Congress, the State waived its
sovereign immunity with regard to the enforcement of the State's
obligation to give a priority to vending machines operated
through the SLA.  A state may declare its intent to submit to the
jurisdiction of a federal forum by agreeing to participate in a
federal program under which Congress has "condition[ed]
participation . . . on a State's consent to waive its
constitutional immunity."  Atascadero State Hosp. v. Scanlon, 473
U.S. 234, 247 (1985).  To constitute a waiver of sovereign
immunity, participation must be something more than "the mere
receipt of federal funds."  Id. at 246 (citations omitted).

Here, the State did not "merely" receive federal funds, because a state cannot accept federal highway funds, as New Hampshire has, without entering into an agreement with the Secretary of Transportation.  See 23 U.S.C. §§ 106 and 110.  One of the required provisions of any such agreement is a promise "to comply with the applicable terms and conditions set forth in title 23, U.S.C."  23 C.F.R. § 630.112(a).  Plainly, giving a priority to vending machines operated through an SLA is a term or condition set forth in title 23.  Moreover, the unambiguous reference to Randolph-Sheppard in § 111(b), in conjunction with the State's statutory and contractual obligation to give a priority, would seem to provide the State adequate notice that, by choosing to place vending machines in interstate highway rest areas, it was also agreeing to subject itself to the grievance-resolution process set out in Randolph-Sheppard with respect to claims seeking to enforce its obligation to give a priority.  Which, of course, is precisely the conclusion the State came to and argued in the earlier case.  See Premo, 119 F.3d at 770 (citation and internal quotation marks omitted) (explaining that "waiver will be found only where stated by the most express language or by

40

such overwhelming implication from the text as [will] leave no room for any other reasonable construction").

However, the relationship between the § 111(b) priority requirement and the Randolph-Sheppard Act, and the subtle issues that arise regarding availability of Randolph-Sheppard administrative redress procedures to vindicate priority rights established by § 111(b), are ones that need not be wrestled with in this case. First the State is bound, at least as far as this particular dispute is concerned, by the earlier judgment in its favor, effectively holding, as the State argued, that Randolph-Sheppard Act administrative remedies are applicable to disputes about vending machine priorities created by § 111(b). Second, the State unambiguously waived any protection it may have enjoyed under the Eleventh Amendment in connection with this particular claim by its conduct in this, as well as in the prior, related litigation.

The law in this circuit is clear: "There is no question that a state may waive its Eleventh Amendment immunity [citation omitted], and it has long been established that a general

41

appearance may constitute such a waiver, e.g., Clark v. Barnard, 108 U.S. 436, 447 (1883)." Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Auth., 744 F.2d 880, 886 (1st Cir. 1984) (appearance in litigation and filing of counterclaim and third-party complaint constituted a waiver of Eleventh Amendment immunity). See also Parker v. Universidad de Puerto Rico, 225 F.3d 1, 9 (1st Cir. 2000) (remanding for district court to determine, inter alia, whether the state effectively waived its sovereign immunity defense through an appearance); Garrity v. Sununu, 752 F.2d 727, 728 (1st Cir. 1984); Hill v. Blind Indus. & Servs. of Md., 179 F.3d 754, 759 (9th Cir. 1999) (state can waive Eleventh Amendment immunity by litigation conduct that is "incompatible with an assertion of Eleventh Amendment immunity").

Obviously, if the State could appear and participate in the initial litigation, seek and obtain a ruling requiring arbitration of CBV's § 111(b) complaints, and participate fully in the subsequent arbitration proceedings, accepting a favorable arbitration decision, but avoiding an unfavorable decision by interposing a late Eleventh Amendment immunity claim, justice

42

would hardly be served.  That is what the State is trying to do here.  As noted by the Ninth Circuit in <u>Hill</u>, 179 F.3d at 756-57:

> Such conduct undermines the integrity of the judicial system.  It also wastes judicial resources, . . . burdens witnesses, and imposes substantial costs upon the litigants. . . .  The integrity of the judicial process is undermined if a party, unhappy with the trial court's rulings or anticipating defeat, can unilaterally void the entire proceeding and begin anew in a different forum.

Similarly, the State's tactics in this case amount to an unequivocal waiver by conduct of its Eleventh Amendment immunity claim - it got what it asked for, it participated fully until it suffered an unfavorable result, and even now, it voluntarily invokes the very statute it says cannot be applied to it, by utilizing the appeal process set out in 28 U.S.C. § 107d-2(a).

Having determined that the State waived its sovereign immunity with respect to the adjudication of CBV's § 111(b) claim before a Randolph-Sheppard arbitration panel, the court is faced with one additional issue: whether § 111(b) creates a private right of action.  In what has been an unfortunate, but consistent style of pleading by the State, it tosses out what can only be described as a fleeting claim to the effect that no private right

43

of action arises under § 111(b).[14]  The passing claim seems aimed

at supporting what appears to be its main point – that Congress

did not properly abrogate the State's Eleventh Amendment immunity

with respect to § 111(b) claims.  The overall impression given is

that the State is simply offering up a point that might add

persuasive value to its position regarding Congress's failure to

abrogate its Eleventh Amendment immunity, and not that the State

seriously contends that no private rights enforceable by CBV

arise under § 111(b).

---

[14] The State writes:

> The TEA 21 [§ 111(b)] and its predecessors do
> not contain any provisions for a private
> right of action to enforce the terms of the
> statute.  As Congress did not create a
> private right of action, there is no language
> whatsoever concerning the jurisdiction of any
> court over actions brought pursuant to the
> statute.  Therefore the TEA 21 fails to
> demonstrate any intent to abrogate States'
> sovereign immunity.  Indeed to the extent the
> TEA 21 discusses the Federal-State
> relationship it explicitly recognizes and
> preserves State sovereignty.  23 U.S.C.
> § 145.

(State's Memo. of Law in Support of Mot. for Sum. J. (document
no. 26).)

44

If, by chance, the State means to assert that no enforceable rights are conferred by § 111(b), then the immediate problem it faces is that it did not make that clear; did not develop its argument; did not brief the issue; provided no analyses of the applicable factors under the familiar Golden-State/Wilder/Suter/Stowell/Albiston[15] template, and, indeed, made reference to no legal authorities whatsoever. Under these circumstances, the court need not consider the casual line in the State's brief mentioning the issue.[16] See Higgins v. New Balance Athletic

_____

[15] See Golden-State Transit Corp. v. Los Angeles, 493 U.S. 103, 106 (1989); Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 509 (1990); Suter v. Artist M., 503 U.S. 347 (1992); Stowell v. Ives, 967 F.2d 65 (1st Cir. 1992); Albiston v. Maine Comm'r of Human Servs., 7 F.3d 258 (1st Cir. 1993).

[16] Had the issue been properly joined, and briefed, it is likely that a right of action enforceable by CBV would have been found to arise from § 111(b) (enforceable under 42 U.S.C. § 1983 at a minimum, or, as determined in the earlier case – enforceable via the administrative process set out in Randolph-Sheppard). After all, § 111(b) unmistakably speaks to and places a clear obligation on the State (it "shall give priority to"); it is fully apparent that Congress intended to economically benefit blind vendors with respect to interstate highway rest areas when it required that a priority be given vending machines operated through the SLA; and, CBV's interest is not so vague and amorphous as to be beyond the competence of the judiciary to enforce – all CBV seeks is the priority right that its members have been denied, and damages arising from the State's usurpation of the economic opportunities Congress meant blind vendors to have.

Moreover, had the State not insisted on litigating CBV's § 111(b) claim under Randolph-Sheppard's administrative dispute-

45

Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) (citations omitted) ("The district court is free to disregard arguments that are not adequately developed."); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 658 (7th Cir. 1998) (citations omitted) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.").

C.    The Merits

Having determined that the State waived, by its litigation conduct, any Eleventh Amendment immunity it might have interposed, the court now turns to the merits.

---

resolution process, and had the earlier case been pursued in this court, declaratory relief, and if necessary, injunctive relief, would likely have followed (against appropriate State officials) to preclude the State from failing to afford the priority required under federal law. See, e.g., Ex parte Young, 209 U.S. 123 (1908); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997). In that event, the State would have been required to stop collecting vending revenue in the first place. Here, the arbitration panel directed the State to disgorge the revenue it should not have obtained (because either licensed blind vendors, or the SLA through sub-contracts, were entitled to that revenue). Accordingly, the arbitration panel's award of damages is merely another way of reaching the same result that would have been achieved had the State not prevailed in having the § 111(b) claim resolved administratively.

1.   Construction of the term "Priority"

The State argues that despite having no obligation to do so (because § 111(b) does not apply to vending machines on "state land"), it nevertheless did extend a priority to vending machines operated through the SLA. The priority given was rooted in Administrative Services' policy, under which vending machine contracts were to be awarded to the SLA whenever the SLA either submitted the highest bid, or a bid that tied for highest. CBV disagrees that the State's claimed policy extended any "priority" to vending machines operated through the SLA, as that term is used in § 111(b). The arbitration panel agreed with CBV, ruling as follows:

> the State professes to afford Blind Vendors priority, as required by Randolph-Sheppard or the Transportation Equity Act, 21st Century [§ 111(b)], pursuant to the State's interpretation of the meaning of "priority" as earlier noted, "high, or tie with high bid." This panel does not accept such interpretation, and is of the opinion that no real or realistic priority is afforded the Blind Vendors on the basis of breaking a tie bidding. Of course, the [S]tate's priority interpretation is not involved at all in the event there is a "highest bid." Accordingly, this panel agrees with the position of the Blind Vendors, that the purpose, and fair interpretation of "priority" within section 111(b) TEA-21 requires the SLA to receive an opportunity to operate vending machines before any private vendor is even pursued . . .

47

Because the State has failed to show that the arbitration panel's decision was based upon an unreasonable or irrational construction of § 111(b), the court declines to set it aside.

The arbitration panel's construction of § 111(b), and, in particular, its construction of the term "priority," presents a question of law, subject to <u>de novo</u> review. <u>Penobscot Air Servs., Ltd. v. FAA</u>, 164 F.3d 713, 718 (1st Cir. 1999) (citations omitted); <u>see also</u> 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law"). However, while the court "review[s] de novo an agency's construction of a statute that it administers, [it does so] subject to established principles of deference." <u>Griffiths v. INS</u>, 243 F.3d 45, 49 (1st Cir. 2001) (citing <u>INS v. Aguirre-Aguirre</u>, 526 U.S. 415, 424-25 (1999); <u>Herrera-Inirio v. INS</u>, 208 F.3d 299, 304 (1st Cir. 2000)).

> Under those principles of deference, if the intent of Congress is clear, it must govern, but where the statute is silent or ambiguous on an issue, the question for the court is whether the agency's interpretation is based on a permissible construction of the statute. <u>See</u> <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43 (1984); <u>Herrera-Inirio</u>, 208 F.3d at 304.

<u>Griffiths</u>, 243 F.3d at 49 (parallel citations omitted).

48

A permissible construction is "one which is 'rational and consistent with the statute.'" NLRB v. Hilliard Dev. Corp., 187 F.3d 133, 140 (1st Cir. 1999) (quoting NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 22 (1st Cir. 1999)). Under principles articulated in Chevron, courts "have traditionally accorded the [agency] deference with regard to its interpretation of the [statute] as long as its interpretation is rational and consistent with the statute." Penobscot, 164 F.3d at 719 (quoting NLRB v. United Food & Commercial Workers Union, Local 23, 484 U.S. 112, 123 (1987)). Moreover, the requirement of rationality and consistency applies not only to the construction an agency gives a statutory term, but also to its explication of the reasoning process that led to its construction. See Penobscot, 164 F.3d at 719 (citations omitted).

As a preliminary matter, it should be noted that although the arbitration panel was convened by the federal Department of Education, and notwithstanding that § 111(b) is, literally, part of a transportation statute, the arbitration panel's construction of the term "priority," as used in § 111(b), is still entitled to judicial deference. While Chevron deference applies to "an

49

agency's construction of a statute that it administers,"
Griffiths, 243 F.3d at 49 (citations omitted), and "[a]gency
regulations interpreting a statute that relates to matters
outside the agency's area of expertise are entitled to no special
deference," Dantran, Inc. v. U.S. Dep't of Labor, 246 F.3d 36, 48
(1st Cir. 2001) (citations omitted) (ruling that Department of
Labor interpretation of the Equal Access to Justice Act were
entitled to no deference), the arbitration panel's construction
of § 111(b) in this case is entitled to Chevron deference even
though the particular statutory provision at issue is not,
strictly speaking, part of the Randolph-Sheppard Act, which the
federal Department of Education is charged with implementing.
This is so for two reasons.

First, as already noted, the arbitration panel construed
§ 111(b) only after the State moved to dismiss Civ. No. 98-011-M
on grounds that CBV was obligated to pursue its § 111(b)
complaint through the grievance-resolution process established in
the Randolph-Sheppard Act.  That is, the State itself construed
§ 111(b) claims as being subject, by incorporation, to the
dispute-resolution processes established in Randolph-Sheppard.

The State's view may or may not have been correct, but that issue is for another day and another case. Having argued for and having obtained that result in the prior related case, leading directly to this case, the State can hardly be heard to argue that the arbitration panel lacks the necessary expertise to construe the term "priority."

Second, the meaning of "priority" as used in § 111(b) is a matter within the arbitration panel's area of expertise. Congress recognized as much when it specifically referenced the Randolph-Sheppard Act in § 111(b). Rather than direct the federal Department of Transportation to determine what is or is not a vending machine operated "through" an SLA, and, by extension, what a priority might be, Congress no doubt anticipated that the federal and state agencies whose job it is to implement legislation providing opportunities for the blind would determine those issues. As between the federal Departments of Transportation and Education, it is plain that the Education Department has the greater expertise and interest in implementing statutory provisions designed to extend vending program opportunities for the blind. The § 111(b) priority originated in

51

and is codified in a transportation statute, but providing vending opportunities to the blind in connection with federal, or federally-controlled, property is a mission traditionally delegated to the Education Department. The arbitration panel's administrative construction of § 111(b) is entitled to deference under Chevron.

The arbitration panel necessarily gave meaning to the term "priority" because Congress did not define the term in § 111(b). See Chevron, 467 U.S. at 843 ("if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute") (footnote omitted). Turning, then, to the panel's construction, no grounds have been presented that warrant setting aside that construction as unreasonable or irrational. The arbitrators determined that: (1) to meet the "priority" requirement of § 111(b), a state must approach its SLA, and the SLA must decline a vending opportunity, before that opportunity may be offered to other vendors; and

52

(2) New Hampshire did not afford licensed blind vendors or the SLA the vending priority to which they were statutorily entitled.

The deferential APA/Chevron standard of review requires the court, on the record before it, to decline to set aside the arbitration panel's construction of the term "priority" in this case. See Chevron, 467 U.S. at 843 n.11 (explaining that "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.") (citations omitted). A sufficient basis exists to affirm the arbitrators' construction of the term "priority."

Affording an SLA the right to accept or decline a vending opportunity, before that opportunity may be offered to other vendors, does extend a priority, as intended by § 111(b), to vending machines operated through the SLA. As the panel noted in its decision, the priority principle it adopted is also given expression in New Hampshire's own Randolph-Sheppard Act equivalent, which requires officials in charge of state property

53

to attempt to contract with the SLA for vending services and to determine, in good faith, that the SLA is unwilling to operate a facility before offering a vending concession to another vendor. See RSA 186-B:13, I.[17]

The system described by the State does not give a priority to vending machines operated through the SLA because the guiding principle behind the State's system is not the extension of economic opportunities to licensed blind vendors, or to the SLA itself, but is, instead, maximizing revenue from vending machine operations for use by the State's Department of Transportation,

---

[17] Not only does the New Hampshire Randolph-Sheppard Act equivalent require first refusal by the SLA before any other vendor may be approached, but the Federal Highway Administration adopted that same principle in its memorandum of March 11, 1993. Because the arbitration panel did not cite that memorandum in its decision, but was presented with it at the hearing on January 11, 2001, it is unclear whether this court may rely upon it in affirming the panel's decision. See Penobscot, 164 F.3d at 720 (explaining that when a reviewing court examines agency action under APA's arbitrary and capricious standard, it "may not supply a reasoned basis for the agency's action that the agency itself has not given") (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Nonetheless, the fact remains that the meaning given by the arbitration panel to the term "priority" is entirely consistent with principles articulated previously in the blind vendor context. The State has identified no authority that has articulated or implemented its "high, or tie with high bid" interpretation of "priority" in this context.

and to enhance the State's general fund.[18]  In other words, while the State claims to have a priority system, it is a system that actually stands the priority required by § 111(b) on its head, and virtually guarantees that, as a matter of economic reality, private vendors will always prevail over blind vendors in the

---

[18] The reported § 111(b) decisions – as limited as that universe may be – do not address the question presented in this case: Whether the State may put its interest in generating revenue for itself from rest area vending machines ahead of blind vendors' priority right to operate those concessions. See Jacobsen v. Bonine, 123 F.3d 1272, 1273 (9th Cir. 1997) (in Arizona, vending machines at interstate highway rest areas are operated by "Arizona's Business Enterprise Program, Services for the Blind [which is] a unit of the Arizona Department of Economic Security, which is the state licensing agency [SLA] . . .); Jacobsen v. Howard, 109 F.3d 1268, 1271 n.3 (8th Cir. 1997) (South Dakota statutes ban commercial establishments on interstate highway rights-of-way, commercial activities in highway rest areas, and businesses that require customers to use highway rights of way during the transaction of business, but make an exception for "vending facilit[ies] vending soft drinks only operated for the benefit of visually impaired vendors licensed by the division of service to the visually impaired"); Sentinel Communications Co. v. Watts, 936 F.2d 1189, 1191-92 (11th Cir. 1991) (Florida "DOT planned to remodel the rest areas [on Interstate 4] and to build gift shops that would be staffed by the Division of Blind Services (DBS) of the Florida Department of Education (DOE). . . .  The Florida DOE, which administers the DBS, is under contract with the DOT.  Pursuant to this agreement, the DOT has delegated to the DBS the authority to install vending machines in interstate highway rest areas . . .").  In short, the statutory right CBV seeks to enforce in this case appears to be honored, as a matter of course, in other states.  The court has found no reported decision in which a state has attempted to condition an SLA's statutory priority to operate vending machines on the SLA's ability to pay compensation to the State equivalent to what a private vendor would pay.

55

bidding process, and the State's general fund will be substantially enriched, at the expense of blind vendors. It is difficult to avoid the obvious intent behind the State's usurpation of blind vendors' rights.

To conclude, because the arbitration panel provided an adequate, rational, non-arbitrary "'explication' of its reasoning," Penobscot, 164 F.3d at 719 (quoting Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 364 (1998)), there is no basis upon which to set aside the panel's finding that the State failed to afford a priority to vending machines operated through the SLA, as it is obligated to do under § 111(b). Under the panel's construction of the term priority, the State is required to offer all interstate highway vending contracts to the SLA before those contracts may be put out to general bid. If the SLA is able to meet the contract specifications with respect to the number and quality of vending machines, the quality and cost of goods to be sold, housekeeping at the vending sites, and the like, then the opportunity to operate interstate rest area vending facilities belongs to the SLA. If the SLA or licensed blind vendors are unable or unwilling to meet bid specifications,

56

then, in that event, the State may solicit bids from other vendors, and award vending contracts on any basis it chooses, including the revenue to be generated for the State. What has occurred here is nothing less than the State's shunting aside the disabled citizens Congress intended to benefit in order to maximize its own general fund.

## 2. Scope of Damages

Both parties argue that the arbitration award is not sustainable, albeit for different reasons.

According to the State, the panel's award is in excess of its statutory authority, see 5 U.S.C. § 706(2)(C), and not supported by substantial evidence, see 5 U.S.C. § 706(2)(E). The State argues that: (1) because CBV's request for arbitration, following this court's dismissal, did not constitute an appeal of a decision by the SLA, the arbitration panel was without authority to award damages; (2) because the Hooksett and Nashua rest areas are located on toll roads, § 111(b) does not apply to them at all, and, therefore, the panel's damages award, to the extent it is based upon contracts related to those rest areas,

57

was beyond the panel's statutory authority and was not supported by the evidence; (3) because the SLA could not meet the specifications of the 1988 Hooksett contract or the 1991 contract for Seabrook, Salem, and Springfield, and expressly declined to match the high bid on the 2001 Hooksett contract, substantial evidence did not support an award of damages based upon those contracts; and (4) the only contract on which damages could be awarded at all is the contract for Lebanon, Canterbury, Sanbornton, and Sutton, and, even if damages were to be awarded based upon that contract, CBV's damages would have to be reduced by the amount of capital expenditures and maintenance costs the State incurred building and maintaining the vending facilities at those rest areas.

CBV says the arbitration panel erred by: (1) awarding damages from October 28, 1998, the date of its complaint (appeal) to the federal Department of Education, rather than January 6, 1998, the date on the complaint it filed in this court in Civ.

58

No. 98-011-M;[19] and (2) failing to award attorneys' fees and costs.

### a.    Authority to Award Damages

The State argues that "any award of damages against the State is prohibited as the Arbitration Panel had no authority to award damages where the Blind Vendors were not seeking determination of the validity of a SLA action."  The State relies on the proposition that a licensed blind vendor may use the dispute resolution procedure outlined in Randolph-Sheppard Act "only for grievances concerning actions by a state licensing agency."  Ga. Dep't of Human Res. v. Nash, 915 F.2d 1482, 1487 (11th Cir. 1990).  CBV's grievance, the State points out, arises from action taken by the Department of Administrative Services in letting vending contracts, and not action taken by the SLA in connection with Randolph-Sheppard Act obligations.

---

[19] In Count II of its counterclaim here, CBV sought damages from 1985 onward, rather than from the date on which it filed suit in Civ. No. 98-011-M.  But CBV appears to have dropped that particular request for relief; it is not mentioned in CBV's motion for summary judgment.

Nash, upon which the State relies, is distinguishable on a factual basis. There, a blind vendor invoked the Randolph-Sheppard Act grievance process in an effort to compel an SLA to challenge a decision by a federal agency concerning vending facilities on federal property. Id. at 1485. In that factual setting, the court of appeals held that "the [Act] supports no action for damages by a blind vendor against a state licensing agency for failure to complain about a federal entity's action." Id. at 1486. Here, by contrast, CBV is not challenging the SLA's failure to take action against a federal agency on its behalf; CBV is challenging the State's failure to give vending machines operated through the SLA the priority they are due under federal law.

In any event, the State's current argument – that CBV's case was not properly before the arbitration panel – ignores the fact that the State insisted, in Civ. No. 98-011-M, that CBV was obligated to pursue its § 111(b) claim against the State under the Randolph-Sheppard grievance process; indeed the State argued that CBV was required to exhaust those administrative remedies before coming to court. The State's current position on the

applicability of the Randolph-Sheppard Act grievance procedure directly contradicts the position on which it prevailed in Civ. No. 98-011-M, and, because neither the State nor CBV appealed that judgment, the State's argument is barred by the doctrine of judicial estoppel. See Faigin, 184 F.3d at 82. Franco v. Selective Ins. Co., 184 F.3d 4, 9 (1st Cir. 1999) (quoting Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987)) ("the First Circuit rule is that judicial estoppel 'should be employed when a litigant is "playing fast and loose with the courts," and when "intentional self-contradiction is being used as a means of obtaining unfair advantage."'") The State has demonstrated more than enough "fast and loose play" in this case to support application of the judicial estoppel doctrine. Because the State successfully argued and obtained a judgment, in Civ. No. 98-011-M, that CBV was barred from initially seeking relief in this court because of both the applicability and the availability of the Randolph-Sheppard Act grievance process relative to CBV's § 111(b) claims – which includes the arbitration step and subsequent appeal to this court – the State is now estopped from conveniently making the exact opposite argument, i.e., that the arbitration panel was without

61

authority to hear CBV's complaint or award damages, because jurisdiction over CBV's complaint lies only in this court.

The State's second argument – that the arbitration panel acted outside its authority – seems to be this. Because the Hooksett and Nashua rest areas were not built with federal money, and are located on toll roads, the priority requirement imposed by § 111(b), which is part of a federal highway funding statute, does not apply to those rest areas. CBV counters that: (1) the State is barred from raising that objection at this point as well, because it failed to assert the argument before the arbitration panel; and (2) the State's argument is wrong on the merits. The State counters that because its argument goes to jurisdiction, it may be raised at any time. Because the court agrees with CBV on the merits, it does not consider CBV's waiver argument.

The substantive issue is straightforward: What did Congress intend when, in § 111(b) it granted states permission to place vending machines "in rest and recreation areas, and in safety rest areas, constructed or located on rights-of-way of the

Interstate System in such State"? According to CBV, the phrase "rights-of-way of the Interstate System" refers to rights-of-way associated with both freeways and toll roads, so long as those rights-of-way are located along the interstate highway system. According to the State, the phrase is intended to exclude rights-of-way located along toll roads, and § 111(b) is intended to apply only to rest areas built with federal aid. Neither party directs the court to relevant precedent, and, given the apparent novelty of New Hampshire's approach to interstate highway vending concessions, it is not at all likely that the question presented has ever been litigated elsewhere.

The issue is one of statutory construction. First, if Congress had intended the § 111(b) requirement to apply only to rest areas constructed with federal aid, it could have said so, but it did not. This court is "obligated to refrain from embellishing statutes by inserting language that Congress opted to omit." Root v. New Liberty Hosp. Dist., 209 F.3d 1068, 1070 (8th Cir. 2000) (citing Keene Corp. v. United States, 508 U.S. 200, 208 (1993)). Second, while the State makes a plausible argument that § 111(b) does not apply to rest areas on toll roads

for which federal funding has not been used, the location of a rest area on an interstate highway that is also a toll road does not render § 111(b) inapplicable. Section 111(b) refers to rest areas "constructed or located on rights-of-way of the Interstate System." Up until 1991, 23 U.S.C. § 129(b) authorized the Secretary of Transportation "to approve as part of the Interstate System any toll road . . . now or hereafter constructed . . . which meets the standards for . . . the Interstate System." Thus, the mere fact that tolls are charged does not mean that a roadway is not part of the interstate system. Therefore, the fact that a rest area is located on a toll road does not render § 111(b) inapplicable, so long as that toll road is also part of the interstate system. Here, the undisputed factual record plainly shows that the Hooksett rest area is located along the interstate system, while the Nashua rest area is not. (Respondent's Ex. I.) Accordingly, only the rest area in Nashua is beyond the reach of § 111(b).

Because the arbitration panel had the authority to award damages both as a general matter[20] and under the circumstances of

---

[20] The general authority of a § 107d arbitration panel to award damages seems beyond dispute. See Premo, 119 F.3d at 770

64

this case, and because § 111(b) applies to all rest areas located along interstate highways in New Hampshire, the only questions remaining are whether the arbitration panel's award of damages, and its decision not to award attorneys' fees, pass muster under 5 U.S.C. § 706.

      b.    <u>The Amount of Damages</u>

The arbitration panel's award of damages qualifies for review under the "arbitrary and capricious" standard set out in § 706(2)(A). When applying that standard, a reviewing court

presumes the agency action to be valid. <u>See</u> <u>Citizens</u> <u>to Preserve Overton Park [Inc.] v. Volpe</u>, 401 U.S. 402,

---

("while it is true that the Randolph-Sheppard Act does not refer expressly to compensatory relief and one circuit judge has concluded that the Act does not permit such relief . . . this view has been largely discredited") (citation omitted). In <u>Premo</u>, the court of appeals affirmed a district court decision upholding an arbitration panel's award of $379,025.05 in lost income and $70,898.65 in attorneys' fees and costs against the state of California. <u>See</u> <u>id.</u> at 767. In <u>Tennessee Department of Human Services v. United States Department of Education</u>, 979 F.2d 1162, 1165 (6th Cir. 1992), the court of appeals reversed a district court decision vacating an arbitration panel's award consisting of eight years' vending machine income, interest, and attorneys' fees against the Tennessee SLA (while also ruling that the plaintiff could not enforce his arbitration award in the federal courts). In <u>Delaware</u>, the court of appeals reversed a district court decision vacating an arbitration panel's award of eighteen months' back pay and attorneys' fees. <u>See</u> 772 F.2d at 1134.

415 (1971); <u>Southern Cal. Edison Co. v. F.E.R.C.</u>, 770
F.2d 779, 782 (9th Cir. 1985). Although the court's
inquiry is to be searching and careful, the ultimate
standard of review for this . . . category [of
challenges to agency action] is a narrow one. <u>See</u>
<u>Overton Park</u>, 401 U.S. at 416.

<u>Ace Lobster Co. v. Evans</u>, 165 F. Supp. 2d 148, 164 (D.R.I. 2001)

(parallel citations omitted), <u>rev'd on other grounds</u>, 311 F.3d

109 (1st Cir. 2002). Under this "highly deferential standard of

review," <u>Airport Impact Relief, Inc. v. Wykle</u>, 192 F.3d 197, 203

(1st Cir. 1999) (citing <u>Citizens Awareness Network, Inc. v. U.S.</u>

<u>Nuclear Reg. Comm'n</u>, 59 F.3d 284, 290 (1st Cir. 1995)),

> "[t]he task of a court reviewing agency action . . . is
> to determine whether the agency has examined the
> pertinent evidence, considered the relevant factors,
> and 'articulate[d] a satisfactory explanation for its
> action including a rational connection between the
> facts found and the choice made.'" <u>Penobscot Air</u>
> <u>Servs., Ltd. v. Federal Aviation Admin.</u>, 164 F.3d 713,
> 719 (1st Cir. 1999) (citing <u>Motor Vehicle Mars. Ass'n</u>
> <u>v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43
> (1983) (citation and internal quotation marks
> omitted)).

<u>Airport Impact Relief</u>, 192 F.3d at 202 (parallel citations

omitted). In sum, "[s]o long as the agency's determination is

'within the bounds of reasoned decisionmaking,' [the court] may

not set it aside, regardless of whether [it] may have reached an

opposite decision." M/V Cape Ann v. United States, 199 F.3d 61, 63-64 (1st Cir. 1999) (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105-06 (1983)).

Turning to the facts of this case, the arbitration panel's award of damages included all commissions paid to the State by all vending machine operators, at all interstate highway rest areas, from October 28, 1998, forward. In addition to its argument that § 111(b) does not apply to rest areas on parts of the interstate system on which tolls are charged, which the court has already rejected, the State also argues that CBV is not entitled to commissions earned from: (1) contracts on which the SLA did not bid (i.e., the first Hooksett contract and the contract for Seabrook, Salem, and Springfield; and (2) the second Hooksett contract, which the SLA declined. The State further argues that CBV could not have met the bid specifications for the two successive contracts for Canterbury, Lebanon, Sanbornton, and Sutton and is entitled to no commissions at all based upon those contracts or, at most, is entitled to the commissions earned by the State less the State's capital and maintenance costs. CBV, of course, argues that it is entitled to the full measure of

67

damages awarded by the arbitration panel, pushed back to the date on which it filed its complaint in this court in Civ. No. 98-011-M.

The State's argument that CBV is not entitled to commissions obtained by the State under the first Hooksett contract and the contract for Seabrook, Salem, and Springfield, has some facial appeal, because the SLA did not bid on those contracts and was, by all accounts, unable to meet the bid specifications, which included construction of vending shelters. That position is undercut, however, by the critical fact that the State did not, as required, give SLA a priority. The State put the contracts out to general bid without first obtaining an affirmative waiver from the SLA. Moreover, even if the SLA was itself incapable of meeting the bid specifications on those two contracts, the arbitration panel found that "[t]he N.H. SLA could have taken advantage of its priority under Section 111(b) of TEA-21 by either having licensed blind vendors operate and maintain machines, or by subcontracting with private vendors to operate and maintain the machines." Given that finding, it was neither arbitrary, capricious, nor in any other way unlawful for the

68

arbitration panel to grant CBV an award based upon commissions the State obtained from the first Hooksett contract and the contract for Seabrook, Salem, and Springfield.

Similarly, it was neither arbitrary nor capricious for the arbitration panel to award damages based upon the commissions the State obtained from the second Hooksett contract. Plainly, the SLA declined to match the high bid submitted on that contract, but, as explained above, being offered the chance to match a high bid is hardly the same thing as being given a § 111(b) priority. By declining to match the high bid on the second Hooksett contract, when offered the opportunity after the State solicited bids from other vendors, the SLA indicated its inability to both meet the bid specifications and pay the same commission rate that the high bidder agreed to pay. However, because revenue for the State is not a permissible contract specification where the SLA is entitled to a priority,[21] the SLA's decision to decline the contract did not amount to an effective waiver of its statutory

_____

[21] As the court has already explained, when the State makes the commission rate a bid specification, it gives itself a priority, rather than giving a priority to the SLA, as it is obligated to do under § 111(b).

priority.[22]  Because the SLA was not afforded a priority with respect to the second Hooksett contract, and could not, therefore, have waived its right to that priority, it was neither arbitrary nor capricious for the arbitration panel to award damages based upon the commissions the State collected under the second Hooksett contract.

The rationale justifying an award of damages based upon the second Hooksett contract also justifies an award of damages based upon both contracts for Canterbury, Lebanon, Sanbornton, and Sutton.  The SLA was not given a priority, but was merely invited to bid on both, and there is no indication in the record that the SLA lost out on either of those contracts for any reason other than the ability of other vendors to pay higher commissions to the State.

Certainly, the arbitrators could have awarded damages on a different basis -- e.g., based on the profits that a licensed

---

[22] The SLA's decision to bid on the two contracts for Canterbury, Lebanon, Sanbornton, and Sutton, gave the arbitration panel a reasonable basis for believing that the SLA could also have met the non-commission specifications for the second Hooksett contract which, like the two contracts for Canterbury, Lebanon, Sanbornton, and Sutton, required no construction.

blind vendor or the SLA would have likely earned from operating vending machines at the eight interstate highway rest areas, while operating those vending facilities in accordance with the non-commission-related contract specifications. However, the commissions earned by the State are easily calculated, represent income to which the State had no legitimate claim, and were obtained only by ignoring its statutory obligations. Thus, for the reasons given above, it was neither arbitrary nor capricious for the panel to assess damages based upon the commission income the State derived from commercial opportunities that rightfully belonged to licensed blind vendors or the SLA acting in their interest.

As noted above, the State contends that if it is liable to pay damages in the form of commissions earned from vending machines at the Canterbury, Lebanon, Sanbornton, and Sutton rest areas, the proper measure of damages is not the total amount of commissions it collected, but rather, its total commission income reduced by the amount the State spent constructing and maintaining vending shelters at those rest areas. The State's position has merit. The arbitration panel's decision relative to

Canterbury, Lebanon, Sanbornton, and Sutton must be vacated, in part.

There have been two successive contracts for vending services at the Canterbury, Lebanon, Sanbornton, and Sutton rest areas. The specifications for the first contract included no construction, only minor electrical and plumbing work that was performed by the successful bidder. Thus, it was neither arbitrary nor capricious for the arbitration panel to award damages in the full amount of commissions obtained by the State under that contract. However, part way through the second contract's term, the vending contractor moved its vending machines from the rest areas themselves into new shelters built by the State, under the authority of RSA 230:30-a, III-a, which had been recently enacted. Thus, the State incurred capital costs that reduced its net gain from the vending revenue stream.

Because the State is entitled to reimbursement for its capital expenses, see RSA 230:30-a, V, it was arbitrary and capricious for the panel to award total commission revenues obtained, without off-setting the cost of obtaining that revenue

stream.  Conveniently, however, RSA 230:30-a, V, establishes the manner in which the State recoups construction and maintenance costs.  The arbitration panel's decision is vacated to the extent it awarded CBV one hundred percent, rather than seventy-five percent, of the State's commission revenue from vending machines located in newly constructed vending shelters at the Canterbury, Lebanon, Sanbornton, and Sutton rest areas (the State is entitled to retain twenty-five percent to cover construction and maintenance costs).

### c.   Starting Date for Damages

The arbitration panel awarded damages measured by commissions obtained from October 28, 1998, forward.  CBV contends that damages should have been awarded from January 6, 1998, forward.

October 28, 1998, is, of course, the date upon which the arbitration panel considered CBV's administrative complaint (appeal) to have been filed with the federal Department of Education.  The panel was aware that CBV had filed its complaint in this court in Civ. No. 98-011-M in January of 1998, and had

filed a request for hearing before the State Education Department on March 30, 1998. Because the administrative complaint from CBV could come to the federal arbitration panel only as an appeal from a decision by a state hearings officer, see 20 U.S.C. § 107d-1(a), it was incorrect, as a matter of law, for the arbitration panel to deem October 28 to be the date on which CBV asserted its claim. Rather, that claim was properly asserted (at least in the context of this case) no later than March 30, 1998, the date on which CBV requested a hearing before the State Education Department, thereby initiating the administrative process the State insisted upon. It was not, however, either legally incorrect, or arbitrary and capricious, for the panel not to find January 6, 1998, to be the date on which CBV asserted its claim. While CBV filed suit (Civ. No. 98-011-M) on January 6, 1998, the arbitration panel was aware that this court had dismissed that case for failure to exhaust the administrative remedies the State argued were available to CBV. Thus, for purposes of this case, the claim was properly asserted in an appropriate forum on March 30. The panel's decision is modified to include damages, as allowed by the panel, for the period March 30 to October 28, 1998.

d.   <u>Attorneys' Fees</u>

Finally, there is the question of attorneys' fees.  The issue arises in this case in two different ways.  First, CBV appeals the arbitration panel's decision not to award it approximately $70,000 in attorneys' fees.  In addition, CBV has filed a motion for attorneys' fees in this court.  In its motion, CBV claims attorneys' fees totaling approximately $95,000 (the difference being attributable to post-arbitration fees).

As noted above, the arbitration panel awarded no attorneys' fees, and gave no explanation for its decision in the text of its order dated July 11, 2001.  The panel did, however, make several relevant rulings of law.  It determined that CBV was not entitled to attorneys' fees under: (1) the precedent established by <u>Nash</u>, 915 F.2d 1482, and <u>Tennessee</u>, 979 F.2d 1162; (2) the rationale of <u>Natural Resources Defense Council, Inc. v. EPA</u>, 484 F.2d 1331, 1338 (1st Cir. 1973) ("private attorney general" theory); (3) the State's common law, <u>e.g.</u>, <u>King v. Thomson</u>, 119 N.H. 219, 222 (1979) (holding that "counsel fees and expenses of a State official who defends a State interest must be paid by the State"); (4) the plain meaning of the Randolph-Sheppard Act, as

75

construed by Nash, 915 F.2d 1482, and Maryland State Department of Education v. United States Department of Veterans Affairs, 98 F.3d 165 (4th Cir. 1996); (5) the legislative history of the Randolph-Sheppard Act, as interpreted by Delaware, 772 F.2d 1123; or (6) the precedent established by Tennessee, 979 F.2d 1162, and Premo, 119 F.3d 764.

CBV appeals the arbitration panel's decision not to award fees, noting its failure to explain its decision. CBV argues that under Delaware, Tennessee, Premo, and Almond v. Boyles, 792 F.2d 451 (4th Cir. 1986), Randolph-Sheppard Act arbitration panels have the authority to award attorneys' fees; that this litigation has been unnecessarily prolonged by the State's obstinacy; and that it should be entitled to fees under the common-benefit doctrine as set out in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 393-94 (1970). The State counters that although the Randolph-Sheppard Act provides that "[t]he Secretary shall pay all reasonable costs of arbitration," 20 U.S.C. § 107d-2(d), attorneys' fees are not properly considered a cost of arbitration. See McNabb v. Riley, 29 F.3d 1303, 1304, 1306 (8th Cir. 1994).

The panel's decision is not incorrect as a matter of law. It falls well within its broad discretion, and it is entirely consistent with the "American rule," under which prevailing litigants are not ordinarily entitled to recover attorneys' fees from losing parties. See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975).

CBV persists – arguing that under Delaware, Tennessee, Premo, and Almond, it is entitled to fees under three exceptions to the American rule: (1) the exception based upon an opponent's bad faith and vexatious litigation tactics; (2) the common-benefit doctrine; and (3) New Hampshire's common-law rule, under which attorneys' fees are available to "private attorneys general."

"In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Alyeska, 421 U.S. at 247. There are, however, several exceptions to the so-called American rule. First, "attorney's fees may be granted . . . if the relevant statute provides for such an award." Bercovitch v. Baldwin Sch., Inc., 191 F.3d 8, 10

(1st Cir. 1999) (citing <u>Alyeska</u>, 421 U.S. at 247).  Second, "a district court [may] award attorney's fees to a prevailing party when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  <u>Dubois v. U.S. Dep't of Agric.</u>, 270 F.3d 77, 80 (1st Cir. 2001) (quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 33 (1991)).  Third, a district court may "award expenses where a plaintiff has successfully maintained a suit, usually on behalf of a class, that benefits a group of others in the same manner as himself."  <u>Mills</u>, 396 U.S. at 392 (citing <u>Fleischmann Distilling Corp. v. Maier Brewing Co.</u>, 386 U.S. 714, 718-19 (1967)).

First, there is no statutory basis for awarding fees to CBV. Neither the Randolph-Sheppard Act nor § 111(b) provides for the recovery of attorneys' fees, and 20 U.S.C. § 107d-2(d) has been authoritatively construed by the Department of Education as excluding an award of attorneys' fees incurred pursuing arbitration.[23]  In short, while Randolph-Sheppard arbitration

---

[23] The only possible statutory basis for an award of attorneys' fees is found at 20 U.S.C. § 107d-2(d), which provides that "[t]he Secretary shall pay all reasonable costs of arbitration under this section in accordance with a schedule of fees and expenses he shall publish in the Federal Register."  In <u>Delaware</u>, the court of appeals suggested, but did not hold, that

78

panels _may_ award attorneys' fees, they are not obligated to do so by the Act.

CBV claims that the State has litigated this case vexatiously.  But, the arbitration panel considered that

---

reasonable costs of arbitration include "a blind vendor's attorney's fees for the arbitration proceeding if the blind licensee is unable to obtain the services of counsel without cost either through a local or State legal services program, or through an interested association or organization."  See 772 F.2d at 1138 n.13 (internal quotation marks omitted); but see Schlank v. Williams, 572 A.2d 101, 110 n.17 (D.C. 1990) (pointing out that the Delaware court based its interpretation of § 107d-2(d) on a federal Department of Education policy statement that was never actually issued).

Here, CBV did not rely upon § 107d-2(d) as authority for an award of fees before the arbitration panel; rather than citing Delaware for the seemingly erroneous dictum in footnote 13, CBV relied upon its holding – that a Randolph-Sheppard Act arbitration panel had discretion to award attorneys' fees under a contract damages theory.  In any event, it is now clear that § 107d-2(d) does not provide for an attorneys' fees award. According to the schedule of fees and expenses published by the Secretary of Education:

> Generally, the Secretary considers reasonable costs of arbitration to include the cost of preparing the official record of arbitration proceedings, professional fees for arbitration panel members, and food, travel, and lodging expenses of panel members and essential witnesses.  The Secretary does not consider attorney's fees to be part of the reasonable costs of arbitration supported by the Secretary.

61 Fed. Reg. 16,700, 16,700 (Apr. 16, 1996); see also McNabb, 29 F.3d at 1306-07.

argument, had before it all the evidence necessary to assess the State's conduct for itself, yet declined to make an award. Thus, the question here is whether the State's conduct since the arbitration panel's decision warrants an award of fees.

It is within the court's discretion, under principles of equity, "to award attorney's fees to a prevailing party when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Dubois, 270 F.3d at 80.

> To invoke this exception [to the American rule] under a claim of "vexatious" conduct, the moving party must demonstrate that the losing party's actions were "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Local 285 v. Nonotuck Resource Assocs., 64 F.3d 735, 737 (1st Cir. 1995).
>
> Because of its potency, however, a "court's inherent power to shift attorney's fees 'should be used sparingly and reserved for egregious circumstances.'" Whitney Bros. Co. v. Sprafkin, 60 F.3d 8, 13 (1st Cir. 1995) (quoting Jones v. Winnepesaukee Realty, 990 F.2d 1, 4 (1st Cir. 1993)). Thus, the power to sanction must be used with great circumspection and restraint, employed only in compelling situations.

Dubois, 270 F.3d at 80.

The State has not litigated this case in a manner warranting a fee award in favor of CBV.  Plainly, the State had a statutory right to appeal the arbitration panel's decision.  <u>See</u> 107 U.S.C. § 107d-2(a).  Furthermore, while CBV's journey back to this court has been a long, and perhaps even an avoidable, one, the case has not been dragged out by the kind of dilatory litigation activity that justified an award of attorneys' fees in <u>Jones</u>, 990 F.2d at 2-3.  The State's pattern of shifting positions on the question of jurisdiction has unquestionably confused and complicated this case, but has not necessarily prolonged it.  And, because colorable arguments may be made on either side of that issue – and have, in fact, been made by the State – the State's litigation strategy, while no doubt aggravating to CBV, does not qualify as "vexatious," as that term is used in the context of equitable fee-shifting.

Finally, CBV is not entitled to fees under the common-benefit doctrine.[24]  That doctrine "permit[s] reimbursement in

_____

[24] The arbitration panel was presented with, and rejected, CBV's argument for attorneys' fees based upon the common-benefit doctrine.  An independent question remains as to whether that doctrine warrants an award of the $25,000 in attorneys' fees incurred after the arbitration panel's decision.

cases where the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." Mills, 396 U.S. at 393-94. As the Supreme Court recently explained:

> the "common fund exception[]" derives not from a court's power to control litigants, but from its historic equity jurisdiction, see Sprague v. Ticonic National Bank, 307 U.S. 161, 164 (1939), and allows a court to award attorney's fees to a party whose litigation efforts directly benefit others. Alyeska, 421 U.S., at 257-258.

Chambers, 501 U.S. at 45.

As the prevailing party, CBV has indeed secured a substantial benefit, in the form of declaratory relief and an award of damages that will benefit its members, an ascertainable class. However, the third prong of the Mills test is not met in this case because an award of attorneys' fees will not serve to spread the costs of litigation among all those who will benefit. Unlike Mills, in which a group of shareholders secured a benefit for all shareholders, the plaintiff in this case, CBV, already

encompasses all who will be benefitted from the favorable outcome of its litigation.[25]  In other words, on the facts presented to the arbitration panel and to this court, CBV represents virtually all licensed blind vendors.  There are no "others" who have been benefitted from this litigation, but are not sharing the burden.  And, absent beneficiaries who are strangers to the litigation – free riders – an award of attorneys' fees would not serve to spread the costs of litigation to persons who stand to benefit from a common fund but who bore no costs associated with its creation.  In the language of <u>Mills</u>, this is a case in which the ascertainable class of beneficiaries is not larger than, but is identical to, the class of plaintiffs.  Accordingly, the common-benefit doctrine provides no basis for an award of attorneys' fees in this case.  The arbitrators' rejection of CBV's fee request is confirmed, and this court declines to award fees.

To sum up, CBV is entitled to an award of damages "payable to the SLA for the appropriate uses benefitting Blind Vendors,"

---

[25] The arbitration panel granted a request for the following finding of fact: "The New Hampshire Committee of Blind Vendors represents all visually impaired individuals in the State of New Hampshire who seek to participate in any program to provide vending services at interstate highway rest areas."

comprised of: (1) one hundred percent of the commissions received by the State from vending machines at: (a) the Hooksett rest areas from March 30, 1998, through the present; (b) the Seabrook, Salem, and Springfield rest areas from March 30, 1998, through the present; and (c) the Canterbury, Lebanon, Sanbornton, and Sutton rest areas from March 30, 1998, through October 31, 1999; and (2) seventy-five percent of the commissions received by the State from vending machines at the Canterbury, Lebanon, Sanbornton, and Sutton rest areas from November 1, 1999, through the present.  CBV's award includes no attorneys' fees.

D.   Equal Protection

In the complaint that initiated its appeal of the arbitration panel's decision, the State raised, for the first time, a constitutional challenge to § 111(b) based upon the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

The State argues that § 111(b): (1) is subject to heightened scrutiny rather than rational basis review, because it impinges upon the constitutional rights of potential vendors who are not

84

blind; (2) fails, under heightened scrutiny, due to the lack of congressional findings demonstrating that: (a) the blind were in need of assistance in 1983, when § 111(b) was enacted; or (b) the blind were any more severely disadvantaged than those with other disabilities; and (3) fails under rational basis review because: (a) "there is no rational relationship between blindness and the ability to operate a vending facility;" (b) the term "blind vendors" and the statutory priority in their favor perpetuate an invidious and demeaning view of the blind and their capabilities; and (c) there has been no showing that any blind vendors would actually choose to operate vending machines at interstate highway rest areas if given a priority in the form of a right of first refusal.

CBV counters that: (1) the State waived its equal protection argument by failing to raise it before the arbitration panel; (2) the State's argument is logically flawed and internally inconsistent to the extent the State claims to give blind vendors a priority while maintaining that to do so is unconstitutional; and (3) § 111(b) is not subject to heightened scrutiny, but only to rational basis review, which it meets.

In its memorandum of law in support of the State's motion for summary judgment, the federal Department of Education points out, correctly, that the Fourteenth Amendment does not apply to the federal government, and that the State's Equal Protection claim should have been made under the Due Process Clause of the Fifth Amendment. The federal agency then goes on to argue that the State: (1) waived its equal protection argument by failing to raise it before the arbitration panel; (2) has no standing to raise an equal protection argument; and (3) is wrong on the merits because: (a) rational basis review applies; and (b) the § 111(b) priority easily passes rational basis scrutiny.

As a preliminary matter, the court notes that while the State focuses its equal protection argument on § 111(b), if it were correct, that same argument would also support, if not require, a determination that RSA § 186-B:9-15 is also unconstitutional. Assuming, without deciding, that the State has standing to challenge § 111(b) on equal protection grounds, see Cohen v. Brown Univ., 101 F.3d 155, 181 n.17 (1st Cir. 1996), the State has either waived or forfeited[26] its equal protection claim

---

[26] There is, of course, a legal distinction between forfeiture and waiver. See United States v. Lopez, 300 F.3d 46,

and, even if not waived or forfeited, the claim would fail on its merits.

The Randolph-Sheppard Act provides for judicial review of arbitration panel decisions, 20 U.S.C. § 107d-2(a), but makes clear that "the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter," 20 U.S.C. § 107d-1(a). Because the statute specifies that arbitration panel decisions are "final and binding," subject to the highly deferential form of review afforded by the APA – rather than to <u>de novo</u> review by the district court, the State had ample notice of its obligation to make all relevant arguments before the arbitration panel. It is well-established in this circuit that courts "will not consider issues which a petitioner failed to present during the administrative process in accordance

---

59 (1st Cir. 2002) (citations and internal quotation marks omitted) (distinguishing between "forfeiture," as a "failure to timely assert a right," and "waiver," as "an intentional relinquishment or abandonment of a known right"). But, because the consequences of forfeiture and waiver are identical under the circumstances of this case – mere forfeiture being adequate to trigger the so-called raise-or-waive rule, see <u>N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n</u>, 198 F.3d 1, 11 n.9 (1st Cir. 1999) – the court need not determine whether the State's actions in litigating this case constitute forfeiture or waiver.

with the relevant procedural requirements." <u>Adams v. U.S. EPA</u>, 38 F.3d 43, 50 (1st Cir. 1994). The State did not raise the issue before the arbitration panel, and the court need not consider it.

Even absent waiver or forfeiture, the State would not prevail on the merits. Under the appropriate standard of review – rational basis – the classification employed in § 111(b) is constitutional, because it is rationally related to a legitimate government interest. The priority given to vending machines operated through state licensing agencies provides an economic opportunity for people disadvantaged economically by virtue of their blindness. The State does not seriously challenge the legitimacy of the government's interest in assisting the blind, and it would seem beyond argument that it is a proper function of government to aid its disabled citizens.

The State also suggests that no legislative findings support Congress's decision to favor the blind with vending opportunities, but not persons with other forms of disability, and that no rational basis exists for making that distinction.

That argument fails for two reasons.  First, as the Supreme Court

explained in Heller, a legislature "has no obligation to produce

evidence to sustain the rationality of a statutory

classification."  509 U.S. at 320.  Second, even if persons with

disabilities other than blindness suffer economic hardships equal

to or greater than those suffered by the blind, the failure of

§ 111(b) to address the full range of economic hardships faced by

the generally disabled does not render the statute invalid on

equal protection grounds.

> _____The problem of legislative classification is a
> perennial one, admitting of no doctrinaire definition.
> Evils in the same field may be of different dimensions
> and proportions, requiring different remedies.  Or so
> the legislature may think.  Or the reform may take one
> step at a time, addressing itself to the phase of the
> problem which seems most acute to the legislative mind.
> The legislature may select one phase of one field and
> apply a remedy there, neglecting the others.  The
> prohibition of the Equal Protection Clause goes no
> further than the invidious discrimination.

FCC v. Beach Communications, Inc., 508 U.S. 307, 316 (1993)

(quoting Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483,

489 (1955)) (footnote omitted).

With respect to the rationality of § 111(b)'s priority, the State contends that CBV has made no showing that any blind vendors would actually benefit from the priority, if offered as a right of first refusal (as required by the arbitration panel). That argument is belied by the fact that the SLA submitted bids on the contract for the Canterbury, Lebanon, Sanbornton, and Sutton rest areas each time it was put out to bid. If given a priority, either a licensed blind vendor, or the SLA acting on behalf of blind vendors, would have operated the machines. Thus, there is a rational relationship between the § 111(b) priority and Congress's legitimate interest in helping the blind.

Because the State has not negated "every conceivable basis which might support" the classification in § 111(b), its equal protection challenge would fail on the merits. Heller, 509 U.S. at 320 (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)).

## Conclusion

For the reasons given, the arbitration panel's decision is affirmed, subject to the modifications noted above concerning

damages. Accordingly: (1) CBV's motion for summary judgment (document no. 24) is granted in part and denied in part; (2) the State's motion for summary judgment (document no. 26) is granted in part and denied in part; and (3) CBV's motion for attorneys' fees (document no. 25) is denied. The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

 

_____
Steven J. McAuliffe
United States District Judge

March 28, 2003

cc: Jack B. Middleton, Esq.
    Joshua Z. Rabinovitz, Esq.
    Robert R. Humphreys, Esq.
    Nancy J. Smith, Esq.